## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE WARDLOW, CHRIS STEVENS, MEGAN MUSSER a/k/a MEGAN HOLLAND, ADELE TURNAGE, BRITTANY KING, YANNET LATHROP, SENIQUA JOHNSON, SETH SHELLEY, TANUJA GOULET ARANY, AMANDA LEONE, HEATHER PRUESS, MEAGAN PRYOR, LAURA BRADY, JAMIE COLEMAN a/k/a JAMIE MCFARLAND, ADELA LEVIS, ANDREA DAVIS, KATIE BONHAM, AMANDA MILLER, NATHAN HARIG, NICHOLE WOLFF, and GARIMA GUPTA, on behalf of themselves and all others similarly situated, | Civil Action No. _____ |
| | |
| Plaintiffs, | **COMPLAINT — CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |
| vs. | |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY d/b/a FEDLOAN SERVICING and d/b/a AMERICAN EDUCATION SERVICES, UNITED STATES DEPARTMENT OF EDUCATION, and ELISABETH DEVOS, in her official capacity as Secretary of Education, | |
| | |
| Defendants. | |

Katherine Wardlow, Chris Stevens, Megan Musser a/k/a Megan Holland, Adele Turnage,

Brittany King, Yannet Lathrop, Seniqua Johnson, Seth Shelley, Tanuja Goulet Arany, Amanda

Leone, Heather Pruess, Meagan Pryor, Laura Brady, Jamie Coleman a/k/a Jamie McFarland,

Adela Levis, Andrea Davis, Katie Bonham, Amanda Miller, Nathan Harig, Nichole Wolff, and

Garima Gupta ("Plaintiffs"), individually and on behalf of those similarly situated, bring this

class action against Defendants Pennsylvania Higher Education Assistance Agency d/b/a

FedLoan Servicing and d/b/a American Education Services ("PHEAA"), the United States

Department of Education ("Department"), and Elisabeth DeVos in her official capacity as
Secretary of Education ("Secretary DeVos") (collectively, "Defendants") for its violations of law
from at least as early as January 1, 2009 through the present ("Class Period"), and upon
knowledge, the investigation of counsel, and information and belief, allege as follows:

## NATURE OF THE ACTION

1.      Student loan debt is now the largest category of non-housing related consumer
debt in the United States, with more than $1.34 trillion outstanding at the end of June 2017. The
overwhelming majority of student loans in the United States are owned by the federal
government through the Department and its secretary, Elisabeth DeVos.

2.      Since June 2009, PHEAA has served as one of four primary servicers of federal
student loan debt. PHEAA's loan servicing business operates as FedLoan Servicing ("FedLoan")
and manages a loan portfolio worth approximately $330 billion.

3.      The Department pays PHEAA an average monthly fee of $2.09 for each of the
approximately 7.5 million unique borrowers PHEAA services. PHEAA also earns interest on
student loans in its portfolio, in addition to receiving subsidies and special allowance payments
from the Department of Education.

4.      In exchange, PHEAA acts as a middleman between the Department and the
borrowers of federally-owned loans. PHEAA is responsible for not only collecting loan
payments, but also offering payment plans, providing advice, and administering federal programs
designed to help borrowers effectively manage the increasing cost of higher education. This
includes several Income Driven Repayment Plans ("IDR"), which provide qualifying borrowers
with relief from student loan debt by adjusting their payments to a reasonably affordable amount
based on their income, occupation, and family size. Borrowers enrolled in an IDR can also apply

to have their federal loans forgiven after a certain number of payments and/or meeting other criteria.

5.      In February 2012, the Department made PHEAA solely responsible for administering the Public Service Loan Forgiveness ("PSLF") program and the Teacher Education Assistance for College and Higher Education ("TEACH") Grant program.

6.      Congress specifically designed the PSLF and TEACH programs to make higher education more affordable for public servants and teachers by providing financial assistance to reduce the burden of their student loans. This includes complete forgiveness of federal student debt for borrowers who commit to ten years of qualifying public service employment and tuition grants of up to $4,000 per year for borrowers who commit to four years of qualifying teaching.

7.      The PSLF and TEACH programs benefit borrowers (and America) by attracting candidates to pursue careers in public service, like teaching, encouraging students to enter tremendously valuable professions by providing loan forgiveness to make the necessary education significantly more affordable.

8.      However, helping borrowers discharge their debt sooner directly conflicts with PHEAA's own financial interest in keeping loans active for as long as possible to continue collecting monthly servicing fees.

9.      In order to maximize fees, PHEAA implemented a scheme during the Class Period to boost revenue by extending the duration of loans in its portfolio through at least three unlawful means:

10.     First, PHEAA delayed or failed to process original applications and annual certification paperwork under the PSLF and TEACH programs. By delaying or failing to process borrowers' application and re-certification paperwork, PHEAA extended the duration of loans in

the PSLF and TEACH programs, allowing PHEAA to collect more in monthly servicing fees. This misconduct directly injured borrowers who were required to make additional payments and remain in qualifying employment for loans that otherwise would have been forgiven.

11.     Second, PHEAA delayed or failed to process applications for federal Income Driven Repayment ("IDR") plans, including specifically the new Revised Pay As You Earn ("REPAYE") program created in 2015. These IDR plans allow borrowers to make lower monthly payments based on their income and family size. They also provide for loan forgiveness after at least twenty years of repayment. PHEAA's processing delays prevented borrowers from making qualifying payments toward this twenty-year repayment period, increasing the amount of servicing fees it collects by extending the duration of loans in an IDR plan.

12.     Third, PHEAA improperly placed borrowers making timely loan payments into deferment or forbearance status—a designation typically reserved for situations where the borrower seeks relief from its payment obligations due to financial hardship. Borrowers who are in deferment or forbearance cannot make qualifying payments that count towards loan forgiveness under the PLSF, TEACH or IDR programs, even though PHEAA continues to collect fees for servicing their loans. Thus, PHEAA's abuse of the deferment and forbearance process artificially increased revenue and extended the duration of loans in the PSLF, TEACH, and IDR programs.

13.     Reports published by the Consumer Financial Protection Bureau ("CFPB") describe complaints from borrowers nationwide of identical, widespread misconduct by PHEAA in its exploitation of the PSLF, TEACH, and IDR programs. These unlawful acts not only caused borrowers to deal with inconvenience and headaches but also to suffer measurable financial harm when: (a) the duration of their loans were extended; (b) interest accrued on the principal balance

of loans during unrequested periods of deferment or forbearance; (c) TEACH Grants were improperly converted into loans, with interest; (d) monthly payments under IDR programs were billed at inaccurate levels; and (e) they were charged additional fees due to delay in processing their applications for the PSLF, TEACH, and IDR programs.

14.     PHEAA's comprehensive strategy to increase loan duration and generate greater servicing fees during the Class Period was hugely successful. Financial statements show that PHEAA's revenue from servicing federally-owned student loans has increased each year, a direct result of the unlawful acts alleged in this Complaint.

15.     This increase in revenue comes at the expense of borrowers, like Plaintiffs and the Class, who were subjected to one or more of PHEAA's illegal tactics while their loans were serviced by FedLoan. As a result, Plaintiffs and the Class have either: lost out on months or years of qualifying loan payments that would have brought them closer to loan forgiveness under the PSLF, TEACH, and IDR programs; incurred thousands of dollars in additional student debt when their TEACH Grants were converted into loans; been overcharged; or otherwise disadvantaged when they were unable to utilize federal programs designed to make their education more affordable.

16.     Based on the continuing complaints described by the CFPB and the pervasive nature of Defendants' misconduct, Plaintiffs believe that further evidentiary support for their claims, as alleged herein, will be revealed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

60.     This court has original subject matter jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 702, and 28 U.S.C.A. § 1361.

61.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds the

sum or value of $5,000,000, exclusive of interest and costs, and is between citizens of different states. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367.

62.     This Court has personal jurisdiction over PHEAA because PHEAA conducts business throughout the United States, including this District, has substantial contacts with this District, and has engaged in the illegal scheme alleged in this Consolidated Amended Class Action Complaint, that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

63.     The Department has waived sovereign immunity as to the relief requested in this matter pursuant to 5 U.S.C. § 702.

64.     Defendants' actions give rise to an actual controversy for purposes of the Declaratory Judgment Act and Article III of the U.S. Constitution. As described herein, Plaintiffs have suffered an invasion of a legally protected interest which is concrete and particularized and actual and imminent. There is a causal connection between Plaintiffs' injuries and Defendants' offensive conduct. And Plaintiffs' injuries will be redressed by a favorable decision.

65.     Jurisdiction and venue are further proper as this Court has already been designated as the Court to handle like claims in the MDL Litigation, *In Re FedLoan Student Loan Servicing Litigation,* MDL No. 2833, 18-md-2833 (E.D. Pa.).

66.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly conduct business in this District and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

### A. Plaintiffs

### Katherine Wardlow

67.     Plaintiff Katherine Wardlow ("Wardlow") is a resident of Rochester, New York. Wardlow received a $2,000 TEACH Grant in 2010 to help pay the costs of pursuing her degree for English as a Second Language from Nazareth College and executed the required Agreement to Serve.

68.     Wardlow has taught full-time as a highly qualified teacher in a high-need field at a school serving low-income students since 2013.

69.     Wardlow submitted the initial 120-day certification upon completing her TEACH eligible program of study in 2012 or 2013 to confirm that she was employed full-time in a qualifying teaching position or intended to meet the terms and conditions of the Agreement to Serve.

70.     Wardlow thereafter submitted the annual certification in 2013, 2014, 2015, and 2016 to certify that she had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

71.     Although Wardlow actively confirmed her intention to satisfy the service obligation, Defendants converted her TEACH Grant to an interest bearing loan in 2016.

72.     As a result, Wardlow began making $50 monthly payments towards her TEACH Loan until February 4, 2019.

73.     On February 4, 2019, Wardlow received notice that her TEACH Loan would be reconverted back into a TEACH Grant and that Defendants would "make the appropriate adjustments to [her] account to ensure that [Wardlow] receive credit for any payments made on those loans." Defendants, however, refunded Wardlow only $193.45.

74.     Wardlow has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loan, (b) provide credit for the four years of qualified teaching she has completed and certified, (c) discharge her obligations under her Agreement to Serve; and (d) correct any credit reporting issues as a result of the grant-to-loan conversion.

**Chris Stevens**

75.     Plaintiff Chris Stevens ("Stevens") is a resident of Redlands, California. Stevens received four TEACH Grants totaling $7,515.60 for the years 2012-2015 to help pay the costs of pursuing his degree from National University.

76.     Stevens has taught full-time as a highly qualified teacher at a school serving low-income students in a high-need field since 2015.

77.     Stevens submitted the initial 120-day certification upon completing his TEACH eligible program of study in 2015 to confirm that he was employed full-time in a qualifying teaching position.

78.     Stevens thereafter submitted the annual certification in April 2016 and April 2017 to certify that he had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

79.     PHEAA denied his 2016 certification because "the teaching service end date your certifying official provided is in the future." In other words, Stevens certified his employment through the end of the school year when he had not yet completed that school year. Stevens made the required change to his dates of employment and resubmitted his certification.

80.     In September 2016, Stevens received notice that one of his Grants had been converted into an interest-bearing loan. When he contacted PHEAA, PHEAA advised that it had not received his certification and refused to reinstate his TEACH Grant.

81.     PHEAA also denied his 2017 certification.

82.     Although Stevens actively confirmed his intention to satisfy the service obligation for both years, Defendants converted his TEACH Grants to interest bearing loans based on a hyper-technicality on the certification form.

83.     Stevens could not afford to make payments towards his TEACH loans and they entered into default status on or about August 14, 2018.

84.     On February 4, 2019 Stevens requested reconsideration of his grant-to-loan conversions. Defendants approved his request on April 24, 2019 but reinstated only one of his four TEACH Grants. Defendants have not reinstated his other Grants.

85.     On April 23, 2019, the Department issued a wage garnishment order to withhold 15% of Stevens' disposable income to collect on the remaining three TEACH loans that Defendants failed to reinstate. To date, the Department has garnished approximately $1,250.00 of Stevens' income.

86.     Stevens has suffered various injuries as a result of Defendants' misconduct, including, failing to (a) reinstate his TEACH Grants upon approval of his reconsideration request, (b) provide a credit or refund for the full amount of principal and interest payments he made towards the TEACH Loans, (c) provide a credit or refund for the amount of income garnished from his wages; and (d) correct any credit reporting issues as a result of the grant-to-loan conversions.

**Megan Musser a/k/a Megan Holland**

87.     Plaintiff Megan Musser a/k/a Megan Holland ("Musser") is a resident of Tinley Park, Illinois. Musser received three TEACH Grants totaling $12,000 from 2008 to 2011 to help pay the costs of pursuing her bachelor's degree in mathematics and psychology from North Central College in Naperville, Illinois.

88.   Musser has taught full-time as a highly qualified teacher at a school serving low-income students in a high-need field since August 2011.

89.   Musser submitted the initial 120-day certification upon completing her TEACH eligible program of study in 2011 to confirm that she was employed full-time in a qualifying teaching position.

90.   Musser thereafter submitted the annual certification in 2012 and 2013 to certify that she had taught for one complete academic year, or was currently teaching, full-time in a qualifying teaching position.

91.   In 2014, PHEAA posted notice of the annual certification obligation only to Musser's paperless inbox at www.myfedloan.com, which Musser was not aware and did not receive. As a result, she missed her certification deadline.

92.   On August 27, 2014, Musser logged into her online account at www.myfedloan.com and saw that her TEACH Grants had been converted to interest-bearing loans.

93.   Musser made approximately $7,325.25 in payments toward her TEACH loans from 2014 to 2019.

94.   In February 2019, Musser requested reconsideration of her TEACH Grant conversion. Defendants approved her request on July 12, 2019 and reinstated her TEACH Grants on September 28, 2019.

95.   On October 4, 2019, PHEAA notified Musser that her TEACH Grant obligation was fulfilled.

96.   Defendants, however, refunded Musser only $1,676.50 of the $7,325.25 in payments she made towards her TEACH loans.

97.     Musser has suffered various injuries as a result of Defendants' misconduct, including, failing to provide a credit or refund for the full amount of principal and interest payments she made towards the TEACH Loans.

**Adele Turnage**

98.     Plaintiff Adele Turnage ("Turnage") is a resident of Gainesville, Florida. From 2009 to 2012, Turnage received multiple FFEL loans to pay for her daughter's college education. Turnage consolidated these loans in 2013 into a Direct Consolidation Loan. Today, Turnage owes approximately $125,000 on the student loans she took out on her daughter's behalf.

99.     PHEAA has been Turnage's student loan servicer since 2013.

100.    After Turnage's loans entered repayment status in 2013, she paid $861.80 per month under the Standard Repayment Plan from June 2013 through July 2014.

101.    When the Standard Repayment Plan amount proved to be unaffordable, Turnage contacted PHEAA for help in August 2014. Rather than advise Turnage about the availability of IDR Plans and review her options, PHEAA steered Turnage into a forbearance from August 2014 through July 2015. Despite the fact she was excused from making any payments during this time, Turnage paid $430.00 per month just to keep up with the interest that was accumulating. Furthermore, when Turnage contacted PHEAA in August 2014 for help, PHEAA failed to disclose that entering forbearance would cause accrued interest to capitalize at the end of the forbearance period. To this end, $4,864.34 of accrued interest was capitalized on Turnage's account on August 5, 2015.

102.    After her forbearance period ended, Turnage again contacted PHEAA in October 2015. At that time, PHEAA finally informed her of the availability of IDR Plans and she enrolled in the IBR Plan. Her new IBR monthly payment was $342.00 – nearly $100 less than the $430

monthly payment she had made without obligation during the 12-month forbearance from August 2014 through July 2015. When Turnage later asked PHEAA why it had not informed her before about IDR Plan options when she first sought help in August 2014, PHEAA replied: "PHEAA isn't required to inform borrowers about these options if the client doesn't ask."

103.    Turnage has suffered various injures as a result of Defendants' misconduct, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Brittany King**

104.    Plaintiff Brittany King ("King") is from Saint Clair, Missouri. In 2011, she attended a one-year program at Sanford Brown College for medical billing and coding. Due to accreditation changes in the field, the college lost its accreditation and closed. King has worked for a qualifying public service organization for the purpose of PSLF since 2016.

105.    King applied for and received multiple Direct Loans to help pay the costs of her education. PHEAA services King's federal student loans.

106.    King has contacted PHEAA repeatedly since leaving school about the difficulties she was having in making her monthly loan payments, which ultimately led to a delinquency on her account. Rather than advise King about the availability of IDR Plans that may provide an affordable monthly payment as low as $0 and assist her in selecting a plan that best fits her needs, PHEAA steered King into periods of economic hardship forbearance and deferment. PHEA further failed to adequately notify her that going into forbearance would capitalize interest.

107.    When King ultimately learned about her IDR Plan options, she submitted an application for an IDR Plan in early 2019. On March 21, 2019, she was approved for the REPAYE plan with a new monthly payment amount of $0. Had Defendants previously advised her of her options, she would have applied for an IDR Plan much earlier and avoided periods of economic forbearance and deferment and the resulting capitalization of interest.

108.    King has suffered various injuries as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Yannet Lathrop**

109.    Plaintiff Yannet Lathrop ("Lathrop") is a resident of Rockville, Maryland. Lathrop earned an undergraduate degree from the University of Minnesota, a Master of Philosophy and Political Science from the New School for Social Research, and a Master in Information Science from the University of Toronto.

110.    From 2003 to 2011, Lathrop received multiple Direct Loans to help pay the costs of her education. In 2011, Lathrop consolidated her loans into Direct Consolidation Loans. Today, Lathrop owes over $200,000 in student loans.

111.    PHEAA has been Lathrop's federal student loan servicer since 2015. Prior to PHEAA, Lathrop's loans were serviced by Mohela.

112.    To help manage her repayment obligations, Lathrop enrolled in an IDR Plan in 2012 and is pursuing loan forgiveness under the PSLF program.

113.    Lathrop has worked for a qualifying public service organization for the purpose of PSLF since 2012. She currently works as a Research and Policy Analyst at the National

Employment Law Project (NELP) in Washington, DC. Previously, Lathrop served as a policy analyst for the Michigan League for Public Policy and was a researcher for the Identity, Privacy and Security Institute of the University of Toronto.

114.    In January 2016, Lathrop timely submitted to PHEAA an IDR Plan Request form for the annual recalculation of her monthly payment and requested that her repayment plan be switched from her existing IBR Plan to the REPAYE Plan.

115.    But PHEAA failed to timely process Lathrop's request. To accommodate its delay, rather than placing Lathrop's loans into a B-9 Administrative Forbearance for up to 60 days, PHEAA improperly placed Lathrop's loans into general forbearance from January 1, 2016 through April 30, 2016. As a result accrued interest was capitalized. Lathrop further could not make any qualifying payments towards PSLF forgiveness, despite being ready, interested, and able to do so.

116.    PHEAA ultimately approved her request and calculated her new payment under the REPAYE Plan on June 8, 2016 – nearly 5 months after her initial request. Despite PHEAA's approval, it placed her account into Administrative Forbearance from June 7, 2016 through June 30, 2016, further denying her the ability to make qualifying payments toward loan forgiveness.

117.    Furthermore, at no time, did Defendants adequately advise her that switching from an IDR Plan to another plan would cause any accrued interest to capitalize. When Lathrop changed plans, an additional interest was capitalized.

118.    Lathrop has suffered various injures as a result of these servicing failures, including: (a) denial of the benefits of an IDR Plan; (b) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (c)

capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Seniqua Johnson**

119.    Plaintiff Seniqua Johnson ("Johnson") is a resident of New Jersey. Johnson attended Oglethorpe University in Atlanta, Georgia, where she earned a Bachelor's degree in psychology in 2009. Since 2012, Johnson has been a Supervisor for the New Jersey Courts.

120.    Johnson applied for and received various federal student loans to help pay the costs of her post-secondary education. Today, Johnson owes almost than $100,000 in student loans.

121.    To help manage her repayment obligations, Johnson is pursuing loan forgiveness under the PSLF program.

122.    PHEAA services Johnson's federal student loans.

123.    After consolidating her loans in 2016, Plaintiff Johnson enrolled in the REPAYE IDR Plan. To ensure she made her payments on time, and to take advantage of a 0.25% interest rate reduction, Johnson enrolled in PHEAA's "direct debit" program, whereby monthly payments are automatically debited from a borrower's bank account. However, at the time she enrolled in its direct debit program, PHEAA placed her account into forbearance status. Johnson did not request PHEAA to place her account into forbearance, nor did PHEAA inform Johnson that the interest on her student loans would capitalize upon leaving the REPAYE plan.

124.    PHEAA improperly steered Johnson into forbearance instead of more beneficial repayment plan options. Johnson has suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to take part in alternative repayment plans; (c) denial of the opportunity to make Qualifying Payments, which delays loan forgiveness

under both the PSLF program and REPAYE plan; (d) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; (e) denial of reduced interest rates available for borrowers in repayment status; and (f) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

125.   Plaintiff Seth Shelley ("Shelley") is a resident of Richmond, Virginia. Shelley earned a bachelor's degree from Penn State University and a Juris Doctor from Pace School of Law. Since graduating law school in 2007, Shelley has worked for qualifying employers under the PSLF program. Today, Shelley is an attorney in the Office of the Capital Defender in Richmond, Virginia.

126.   From 2004 through 2007, Shelley applied for and received various federal student loans to help pay the costs of attending law school. Today, Shelley owes approximately $30,000 in student loans. To help manage his repayment obligations, Shelley enrolled in IDR Plans and is pursuing loan forgiveness under the PSLF program. PHEAA has serviced Shelley's federal student loans since mid-2012.

127.   On several occasions since 2012, PHEAA improperly placed Plaintiff Shelley's loans into forbearance while it processed his annual IDR recertification paperwork. Shelley was not able to make qualifying payments during these months of forbearance. In these instances, Shelley either did not request the placement of his loans into forbearance or agreed to place his loans into forbearance at PHEAA's recommendation.

128.   Plaintiff Shelley has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF Program since 2008. Shelley should have been eligible to apply for PSLF loan forgiveness in 2018. However, Defendants miscounted his qualifying payments.

129.     Because of inconsistent information he has consistently received from PHEAA, Shelley delayed applying for forgiveness under the PSLF program until paying his November 2019 bill. To this end, Shelley logged into his online PHEAA account on October 16, 2019 to view his November 2019 bill and schedule payment of that bill for October 17, 2019. When he logged into his account on October 16, 2019, his account displayed a projected forgiveness date of November 7, 2019 for both of his loans, consistent with his mid-2018 review of his account and close to the date provided in the letter he received from PHEAA on March 20, 2018. Shelley logged back into his account on October 17, 2019. When he did so, his account displayed a projected forgiveness date of May 7, 2019, which is close to the date provided in the other letter described above, the one dated May 17, 2018. Shelley contacted PHEAA who indicated that Shelley made his 120th Qualifying Payment months ago.

130.     On October 21, 2019, PHEAA sent Shelley a letter, dated October 19, 2019, advising him to apply for loan forgiveness under PSLF, which he did, also on October 21, 2019.

131.     In 2018, Plaintiff Harig submitted a PSLF Employment Certification. Despite having made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, since April 2011, Defendants have credited Harig with only 70 payments as of October 3, 2018.

132.     Defendants failed to properly count Shelley's qualifying PSLF payments, which has delayed her loan forgiveness under the PSLF program. Shelley has suffered various injuries as a result of Defendants' misconduct, including the: (a) the opportunity to make qualifying payments towards the PSLF program and IDR Plan, which has delayed his progress towards loan forgiveness; (b) denial of Federal Interest Subsidies that the Department must contribute during repayment; (c) capitalization of accrued interest, which adds to his principal and increases

monthly payment amounts; and (d) requiring Shelley to make more than the required 120-payments for loan forgiveness under PSLF.

**Tanuja Goulet Arany**

133.    Plaintiff Tanuja Goulet Arany ("Arany") is a resident of Loma Linda, California. Arany earned the degrees of Doctor of Acupuncture and Oriental Medicine from Oregon College of Oriental Medicine after earning her Master degree from the same school. Until July 2019, Arany owned and operated the Tanuja Goulet Acupuncture & Oriental Medicine clinic, a small business in Bend, Oregon.

134.    From 2010 to 2014, Arany received various Direct Loans to help pay the costs of her post-secondary education. Today, Arany owes more than $250,000 in student loans, which because of interest capitalization, is approximately $40,000 more than when she completed her education just five years ago. PHEAA services Arany's federal student loans.

135.    To help manage her repayment obligations, Arany consolidated her Direct Loans into Direct Consolidation Loans in 2014.  She has been enrolled in an IDR plan since consolidating her loans.

136.    In late 2015, Arany timely submitted to PHEAA an IDR Plan Request form for the annual recalculation of her monthly payment.

137.    PHEAA rejected Arany's IDR Plan Request, citing Arany's failure to provide supporting documentation of her annual income.

138.    In December 2015, Arany responded to PHEAA, explaining she could not provide a paystub or similar document because, as a small business owner, such documentation did not exist. Instead, Arany provided a summary of her small business' gross earnings.

139.    PHEAA did not timely process Arany's 2015 IDR Plan Request and supporting documentation. As a result, PHEAA instead placed Arany's account into forbearance status, causing $22,707.56 of accrued interest to capitalize on or about January 2, 2016.

140.    Arany has suffered various injures as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under an IDR plan; (c) denial of federal interest subsidies that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Amanda Leone**

141.    Plaintiff Amanda Leone ("Leone") is a resident of New Jersey. Leone attended Lafayette College in Easton, Pennsylvania, where she earned a bachelor's degree in Political Science and Government in 2010. She then enrolled at Seton Hall University School of Law, where she earned her Juris Doctor in 2013. Upon graduation, Leone clerked for the Honorable Thomas R. Vena, J.S.C. in the Superior Court of New Jersey. Today, she is an attorney in New York City.

142.    Leone received various Direct Loans to help pay the costs of her education. Today, Leone is enrolled in the PAYE income-driven repayment plan. PHEAA services Leone's federal student loans.

143.    PHEAA has improperly placed and/or kept Leone's account in forbearance when it required more time to process her annual IDR application. Leone submitted her IDR request sometime before March 23, 2016, at which time PHEAA confirmed its receipt via email. On April 12, 2016, PHEAA notified Leone that "[a]t this time, we are currently experiencing a high

volume of IDR requests." PHEEA continued, thanking Leone "for [her] patience as [PHEAA] work[s] through this unexpectedly high volume of requests."

144.    Furthermore, Defendants failed to notify Leone that switching IDR plans would cause accrued interest to capitalize. Defendants' omission was particularly damaging to Leone, who regularly followed the IDR application's recommendation that she choose "the income-driven repayment plan with the lowest monthly payment." However, because the payment amounts of each plan may change from year-to-year, so too may the plan "with the lowest monthly payment." To this end, $2,270.35 of accrued interest capitalized on June 1, 2016 after Leone submitted an IDR request on or about May 12, 2016.

145.    Leone has suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

> **2.  Choose a plan and then continue to Item 3.**
> ☐ (Recommended) I want the income-driven repayment plan with the lowest monthly payment.
> ☐ REPAYE          ☐ IBR
> ☐ PAYE             ☐ ICR

**Heather Pruess**

146.    Plaintiff Heather Pruess ("Pruess") is a resident of Portland, Oregon. She earned a Bachelor of Science in Sociology from Boise State University in 2000 and an MPA in Public Administration/Nonprofit Management in 2007 from Portland State University. Since graduating in 2007, Pruess has worked for a PSLF qualifying employer while making consistent on-time loan

payments for the full amount due. Today, Pruess is a Donor Relations Officer at a statewide community foundation supporting diverse communities across Oregon through philanthropy.

147.    From 1995 to 2000 and 2005 to 2007, Pruess applied for and received various Direct Loans to help pay the costs of her education. Today, Pruess owes approximately $100,000 in student loans. To help manage her repayment obligations, Pruess is pursuing loan forgiveness under the PSLF program. PHEAA services Pruess' federal student loans.

148.    On January 22, 2017, Pruess received a letter from PHEAA advising her that her IDR recertification deadline was March 27, 2017. Pruess submitted her recertification paperwork in early February 2017, well before this deadline. Still, PHEAA failed to process Pruess' paperwork until May 2017.

149.    Furthermore, at no time, did Defendants adequately advise Pruess that switching from an IDR Plan to another plan would cause any accrued interest to capitalize.

150.    As a result of the above delays in processing her paperwork and/or from switching IDR plans, $4,667.25 of accrued interest capitalized on February 22, 2017 and another $530.04 of interest capitalized on April 11, 2017.

151.    Pruess suffered various injuries as a result of PHEAA's mismanagement, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the opportunity to make qualifying payments towards loan forgiveness under the PSLF program and the IDR Plan; (c) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Meagan Pryor**

152.     Plaintiff, Meagan Pryor ("Pryor"), is a resident of Pennsylvania. Pryor graduated from Nova Southeastern University with a Psy. D. in Clinical Psychology. Upon completion of her program, Pryor began practicing as a psychotherapist under the supervision of a licensed psychologist. Pryor became licensed as a clinical psychologist in March of 2018, at which time she started to practice independently.

153.     Pryor received Direct Loans to pay for her education. Today, Pryor has approximately $332,000 in student loans outstanding including principal and interest. PHEAA has been Pryor's loan servicer since May 2013.

154.     On November 29, 2014, PHEAA notified Pryor that her annual IDR certification was due within 10 days of January 25, 2015. On January 24, 2015, Pryor mailed her IBR certification along with a letter dated that same date. The letter enclosed Pryor's income tax documents for verification purposes, and explained that because Pryor had not yet received her 2014 tax documents from her former employer, she included her final pay stub which reflected her full year earnings. In response to her submission, Pryor received a letter from PHEAA dated January 30, 2015 titled "the IBR application you requested."

155.     Thereafter, in March 2015, PHEAA recalculated Pryor's loan repayment amounts under the Standard Repayment Plan at a much higher monthly payment than under IBR, notwithstanding that even if it were determined that the application was late, PHEAA had Pryor's income documentation and the ability to recalculate her new IBR monthly payments under the Missed Deadline Exception, as regulations require.

156.     On March 27, 2015, Pryor submitted an IBR application and additional materials after it was determined that the documents sent on January 24, 2015 were not sufficient. Faced with a much higher new payment amount, Pryor agreed under duress to be placed into general

forbearance for approximately two months starting in March 2015. As a result, PHEAA capitalized over $34,000 in interest on her loans increasing her principal balance dramatically.

157.    Pryor has suffered various injuries as a result of PHEAA's failure to process her IDR paperwork, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of Federal Interest Subsidies that the Department must contribute on her behalf during repayment; (c) denial of the opportunity to make qualifying payments towards forgiveness under an IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Laura Brady**

158.    Plaintiff Laura Brady ("Brady") is a resident of Smithtown, New York. From 2010 to 2013, Brady received various Direct Loans to help pay the costs of her education. Today, Brady owes approximately $125,000 in student loans.

159.    Brady has worked for a qualifying public service organization for the purpose of PSLF since 2013, including as a Child Life Specialist at Stony Brook Children's Hospital in Stony Brook, NY.

160.    Brady enrolled in the IBR repayment plan and is pursuing loan forgiveness under the PSLF program. PHEAA services Brady's federal student loans.

161.    In 2017, PHEAA posted notice of the annual IDR recertification deadline to Brady's paperless inbox at www.myfedloan.com, which Brady was not aware and did not receive. As a result, Brady missed the recertification deadline, which caused $7,615.73 interest to capitalize and her monthly payment to jump from $192 to almost $2,000.

162.    Brady contacted PHEAA, who steered her into forbearance in October and November 2017. Brady returned to her IBR plan in December 2017.

163.     Brady has suffered various injuries as a result of Defendants' misconduct, including the: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**<u>Jamie Coleman</u>**

164.     Plaintiff Jamie Coleman a/k/a Jamie McFarland ("Coleman") is a resident of Wharton, New Jersey. Coleman earned a bachelor's degree in psychology and minor in Spanish from the University of Delaware in 2008, and a master's degree in social work from Rutgers University in 2010. In 2010, Coleman took out Direct Loans to pay for her master's degree.

165.     Since graduating, Coleman has worked for a PSLF qualifying employer. Coleman is currently employed as a legal advocate for victims of domestic violence. Coleman previously worked with children who experienced trauma, as well as at a shelter for pregnant women.

166.     To help manage her repayment obligations, Coleman enrolled in an IDR plan and began pursuing forgiveness through the PSLF Program. She has made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, for at least the past 8 years.

167.     In October 2017, Coleman submitted a PSLF Employment Certification to her previous loan servicer, after which her loans were transferred to PHEAA as the exclusive PSLF loan servicer. On December 5, 2017, PHEAA notified Coleman that it provided her credit for only 32 of her 86 qualifying payments.

168.     On November 8, 2017, Coleman submitted her annual IDR Plan Request form and requested a change from the IBR Plan to REPAYE. Coleman contacted PHEAA and

specifically inquired if interest would capitalize upon switching plans. PHEAA confirmed (incorrectly) that it would not.

169.     Upon processing Coleman's request to switch plans, $7,352.15 accrued interest capitalized on December 14, 2017.

170.     Coleman has suffered various injuries as a result of Defendants' misconduct, including the: (a) denial of credit for PSLF qualifying payments she is entitled to, which delays forgiveness under the PSLF Program, and (b) capitalization of accrued interest, which increases her principal loan balance monthly payment amount.

**Adela Levis**

171.     Plaintiff Adela Levis ("Levis") is a resident of Arlington, Virginia. In 2005, Levis earned a Bachelor of Arts in German Literature from Oakland University. She then studied at American University, where she earned a Masters degree in International Politics. In addition to her current studies, Levis is an Academic and NGO Liaison at the U.S. Department of State, where she has served in various capacities since 2010. The U.S. Department of State is a qualifying public service organization for the purpose of PSLF.

172.     In 2006, Levis consolidated her undergraduate student loans into Direct Consolidation Loans. From 2009 to 2012, Levis received various Direct Loans to help pay the costs of her post-graduate education.

173.     PHEAA has been Levis' student loan servicer since May 2017. Prior to PHEAA, Levis' student loan servicer was Nelnet.

174.     To help manage her repayment obligations, Levis enrolled in the REPAYE Plan in or about May 2013. She is pursuing loan forgiveness under the PSLF program.

175.    In April 2017, Levis submitted a PSLF Employment Certification Form to Nelnet, her then student loan servicer. Her loans were then transferred to PHEAA (as the exclusive PSLF loan servicer).

176.    Since at least May 2013, Levis has made consistent on-time qualifying payments for the full amount due while working for the U.S. Department of State – a PSLF qualifying employer.

177.    PHEAA incorrectly determined, however, that Levis made only 12 PSLF qualifying payments as of January 2019.

178.    Levis has suffered various injures as a result of these servicing failures, including: (a) exhaustion of her eligibility for forbearance in the future, when she may actually need it; (b) denial of the benefits of an IDR Plan; (c) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (d) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**<u>Andrea Davis</u>**

179.    Plaintiff Andrea Davis ("Davis") is a resident of East Hartland, Connecticut. Davis has worked for a qualifying public service organization for the purpose of PSLF since 2010, including as a Hearing Parole Officer for the State of Connecticut Board of Pardons and Paroles. Previously, she worked at The Connection, Inc., a nonprofit, from 2006 to 2010.

180.    Davis applied for and received federal student loans to help pay the costs of her education. Today, Davis owes approximately $75,000 in student loans. To help manage her repayment obligations, Davis consolidated her loans on or about September 27, 1999, is now enrolled in the IBR Plan, and is pursuing loan forgiveness under the PSLF program. PHEAA is Davis' federal student loan servicer.

181.    Davis has made consistent, on-time, monthly payments as required under the PSLF program for more than ten years while working for a PSLF qualified employer. However, PHEAA has credited her for only 59 payments as of June 2019.

182.    Davis has suffered various injures as a result of these servicing failures, including: (a) denial of the benefits of an IDR Plan; (b) denial of the opportunity to make qualifying payments towards forgiveness under both the PSLF program and IDR plan; and (c) capitalization of accrued interest, which adds to her principal and increases her monthly payment amount.

**Katie Bonham**

183.    Plaintiff Katie Bonham ("Bonham") is a resident of Alabama. She graduated from Faulkner University with degrees in criminology and psychology. Since January 2009, Bonham has worked for a PSLF qualifying employer while making consistent on-time loan payments for the full amount due. To this end, for the last ten years, Bonham has served as a law enforcement officer.

184.    Bonham received Direct Loans to help pay the costs of her education. Today, Bonham still owes approximately $23,000 in federal student loans. To help manage her repayment obligations, Bonham began pursuing loan forgiveness under the PSLF program.

185.    Bonham has made consistent, on-time, monthly payments as required by the PSLF program for more than ten years while working for a PSLF qualified employer. However, PHEAA has credited her for less than 60 payments.

186.    Wolff has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans, and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR plan.

**Amanda Miller**

187.    Plaintiff Amanda Miller is a resident of Richmond, Virginia. Miller attended Thiel College in Greenville, Pennsylvania, where she earned a bachelor's degree in Psychology and Criminal Justice in 2014. She then enrolled at Marymount University, where she earned her Master of Arts in Forensic and Legal Psychology in 2014. Since graduating in 2014, Miller has worked for a PSLF qualifying employer while making consistent on-time loan payments for the full amount due. Today, Miller is a Capital Mitigation Specialist with the Office of the Capital Defender in Richmond, Virginia.

188.    Miller received various Direct Loans to help pay the costs of her education. Today, Miller owes almost $100,000 in student loans. To help manage her repayment obligations, Miller enrolled in an IDR Plan and is pursuing loan forgiveness under the PSLF program. PHEAA has serviced Miller's federal student loans since January 2017. Prior to that, Miller's loans were serviced by Navient.

189.    Miller has made consistent, on-time, monthly payments under an IDR Plan since January 2017. As a result, she should have approximately 30 Qualifying Payments towards loan forgiveness under the PSLF program. However, PHEAA has credited her for less than half that amount.

190.    Miller has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans, and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR plan.

**Nathan Harig**

191.    Plaintiff Nathan Harig ("Harig") is a resident of Carlisle, Pennsylvania. Harig earned a bachelor's degree in political science from St. Vincent's College in 2008 as well as a

master's degree in transatlantic studies from Jagiellonian University in 2010. Harig received Direct Loans to pay for his master's degree.

192.    Since graduating, Harig has worked for a PSLF qualifying employer. Harig is currently employed as the Assistant Emergency Medical Service Chief in Pennsylvania at Cumberland Goodwill Emergency Medical Services.

193.    To help manage his repayment obligations, Harig consolidated his Direct Loans in 2011, enrolled in an IDR plan, and began pursuing forgiveness through the PSLF Program.

194.    PHEAA has been Harig's loan servicer since May 2014, although his loans previously had been transferred among other loan servicers three times between 2011 and 2014.

195.    In 2018, Harig submitted a PSLF Employment Certification. Despite having made consistent, on-time, monthly payments while working for a PSLF qualifying employer, as required by the PSLF program, since April 2011, Defendants have credited Harig with only 70 payments as of October 3, 2018.

196.    Harig requested that PHEAA review his payment history to confirm the number of qualifying payments made towards PSLF.  However, PHEAA has not provided Harig with credit for the "missing" qualifying payments he has made.

197.    Harig has suffered various injuries as a result of Defendants' misconduct, including the denial of credit for PSLF qualifying payments he is entitled to, which delays forgiveness under the PSLF Program.

**Nichole Wolff**

198.    Plaintiff Nichole Wolff ("Wolff") is a resident of Depoe Bay, Oregon. She earned a Bachelor of Science and Master's from the University of Minnesota. Wolff received various Direct Loans to help pay the costs of her education. On or about June 18, 2007, Wolff

consolidated her loans into Direct Consolidation Loans. Today, Wolff still owes approximately $30,000 on her student loans.

199.    PHEAA has been Wolff's student loan servicer since December 2016. Prior to PHEAA, Wolff's loans had been serviced by other loan servicers.

200.    Wolff has worked for a qualifying public service organization for the purpose of PSLF since graduating in 2005 and has made consistent, on-time PSLF qualifying payments during this time.

201.    In August and September 2016, Wolff submitted PSLF Employment Certification Forms, one for each of her two employers, to EdFinancial Services, LLC, her then student loan servicer. Her loans were then transferred to PHEAA (as the exclusive PSLF loan servicer). PHEAA notified Wolff in writing of the transfer and acknowledged her interest in PSLF. PHEAA, however, did not advise Wolff that she was not on a PSLF-eligible repayment plan. Wolff's prior loan servicers also failed to advise her that she was not on a PSLF-eligible repayment plan.

202.    Having made 120-months of payments as of 2017, Wolff submitted a PSLF application for loan forgiveness in the second half of that year.

203.    After several months, during which she continued to make monthly payments, Wolff contacted PHEAA to ask about the status of her PSLF application. Only then did Defendants inform her that she was not on a PSLF-eligible repayment plan and had not made a single qualifying payment. PHEAA reviewed with Wolff her repayment plan options, including both PSLF-eligible and non-PSLF-eligible repayment plans.

204.    However, because Wolff has been diagnosed with Stage 4 appendix cancer and her health is uncertain, Wolff chose to enroll in the repayment plan with the lowest monthly

payment, which was a non-qualifying PSLF repayment plan. She continues to make her monthly payments under this new payment schedule.

205.    Had the Department and its loan servicers timely advised Wolff that she was not on a PSLF-qualifying repayment plan, she would have already obtained PSLF loan forgiveness.

206.    Wolff has suffered various injuries as a result of Defendants' misconduct, including: (a) denial of the benefits of IDR Plans; and (b) denial of the opportunity to make qualifying payments, which delays loan forgiveness under the PSLF Program and her IDR plan.

**Garima Gupta**

207.    Plaintiff Garima Gupta ("Dr. Gupta") is a resident of Kensington, California. Gupta earned a Bachelor of Arts at the University of California – Berkeley and a Master of Arts at the University of Southern California. She then attended medical school at Touro University College of Osteopathic Medicine. Gupta received Direct Loans in at least 2002, 2003, and from 2010 to 2012 to pay for her education.

208.    Dr. Gupta worked for a PSLF qualifying employer from 2013 to 2019. Dr. Gupta currently practices critical care medicine and is affiliated with Alta Bates Summit Medical Center and Eden Medical Center in and around Oakland, California.

209.    To help manage her repayment obligations, Dr. Gupta consolidated her Direct Loans in 2013, enrolled in an IDR plan, and began pursuing forgiveness through the PSLF Program.

210.    PHEAA has been Dr. Gupta's loan servicer since April 2014.

211.    Defendants have credited Dr. Gupta with fewer qualifying payments than she is entitled as a result of having made consistent, on-time, monthly payments while working for a PSLF qualifying employer from 2013 to 2019, as required by the PSLF program.

212.     Dr. Gupta has suffered various injuries as a result of Defendants' misconduct, including the denial of credit for PSLF qualifying payments she is entitled to, which delays forgiveness under the PSLF Program.

213.     Plaintiffs Musser, Stevens, and Wardlow are collectively referred to as the "TEACH Plaintiffs."

214.     Plaintiffs Arany, Brady, Coleman, Leone, King, Lathrop, Pruess, Pryor, Shelley, Turnage, Johnson, and Wolff are collectively referred to as the "IDR Plaintiffs."

215.     Plaintiffs Bonham, Coleman, Davis, Harig, King, Lathrop, Levis, Miller, Pruess, Shelley, Gupta, Johnson, and Wolff are collectively referred to as the "PSLF Plaintiffs."

**B.  Defendants**

216.     Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") is a Pennsylvania corporation with its principal place of business at 1200 North 7th Street, Harrisburg, Pennsylvania 17102.

217.     PHEAA is a national provider of student financial aid services, including servicing of student loans owned by the federal government.

218.     PHEAA conducts its federal student loan servicing activities as FedLoan Servicing ("FedLoan"). PHEAA is financially independent of the Commonwealth of Pennsylvania, generates its own commercial revenue, and makes its own fiscal and policy decisions.

219.     Defendant United States Department of Education ("Department") is a United States federal agency headquartered in the District of Columbia with its principal office located at 400 Maryland Avenue, SW, Washington DC, 20202.

220.     Defendant Elisabeth DeVos ("Secretary DeVos") is sued solely in her official capacity as Secretary of Education, in which capacity she has the ultimate responsibility for the activities of the Department, including the actions complained of in this Consolidated Amended Class Action Complaint.

221.     Secretary DeVos maintains an office at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

**A.     Federal Student Loans and Loan Forgiveness Programs**

**1.  Federal Student Loans**

222.     Approximately 92%, or $1.4 trillion, of all outstanding student loan debt is currently owned by the federal government.[1]

223.     Federal student loans offer many benefits that don't typically accompany private loans. These include fixed interest rates, income-based repayment plans, loan cancellation for certain types of employment, deferment (postponement) options, and interest rate reduction based on repayment method. Also, private loans usually require a credit check, while most federal loans for students do not.

224.     Since 1965, federally guaranteed student loans have been available either through the Federal Family Education Loan ("FFEL") (1965 – 2010) or the William D. Ford Federal Direct Loan ("Direct Loan") (1994 – present) Programs.

---

[1] Teddy Nykiel, *2019 Student Loan Debt Statistics*, Nerd Wallet, (Sept., 2019), *available at* https://www.nerdwallet.com/blog/loans/student-loans/student-loan-debt/.

225.    The FFEL Program was established by the Higher Education Act of 1965

("HEA") and guaranteed student loans issued by private lenders to students and parents. The

Program was terminated in 2010 with the passage of the Health Care and Education

Reconciliation Act of 2010. Although no new FFEL loans have been made since June 30, 2010,

millions of FFEL loans originated and disbursed on or before that date are still serviced today.

226.    The Direct Loan Program was authorized by the Student Loan Reform Act of

1993 under the HEA,[2] and was first implemented in the 1994-1995 academic year. Loans issued

under the Direct Loan Program are issued directly to students and parents through the

Department of Education. Unlike FFEL Loans, Direct Loans originate with the Department and

are funded through the U.S. Treasury. Since the termination of the FFEL Program in 2010, all

new federal loans have been disbursed under the Direct Loan Program.

227.    The FFEL and Direct Loan Programs were designed to expand access to higher

education to those who have financial need and to serve the best interests of students. The Senate

Health Committee on Health, Education, Labor, and Pensions ("HELP") stated in its 2007

Report on the HEA:

> The committee believes strongly that lenders, guaranty agencies and
> institutions of higher education must act with honesty and integrity
> at all times to ensure that the financial aid programs under title IV
> serve the ***best interests of students***.[3]

228.    The Department echoed that objective in a June 2008 "Dear Colleague" letter,

noting the Department's "pledge to work with the student lending community in forward looking

---

[2] 20 U.S.C. §§ 1087a, et seq.
[3] H.R. Rep. No. 110-500, at 240 (2007), *available at*
https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf (last visited Oct. 15, 2019) (emphasis
added).

solutions to ensure FFEL Program and other student lending programs ***serve the best interests of students*** and taxpayers for years to come."[4]

229.    Similarly, the House of Representatives Committee on Education and Labor stated: "[t]he nation's financial aid system exists for a single purpose: ***to serve students*** and their families.[5]

## 2. Repayment and Income-Driven Repayment ("IDR") Plans

230.    When federal student loans first enter repayment, borrowers may select from one of several repayment plans.

231.    Under the Standard Repayment Plan, a borrower's monthly payments are fixed and calculated to allow borrowers to repay their debt in ten years. This plan typically results in the highest monthly payment amount, but less interest over the term of the loan. The Standard Repayment Plan is the default repayment plan for borrowers who have not chosen another plan.

232.    Borrowers may also choose the Graduated Repayment plan, which maintains a 10-year repayment term but allows the payments to start small and gradually increase every two years, or the Extended Repayment plan, which extends the repayment term to as much as 25 years and allows for either fixed or graduated monthly payments.

233.    Recognizing the financial challenges that student borrowers face when repaying their loans, the federal government, as compared to a private lender, also offers four unique IDR Plans designed to make the repayment of student loans less onerous and to help borrowers manage their student loan debt. These plans include:

- Income-Contingent Repayment ("ICR");

---

[4] FSA Publication (June 19, 2008), *available at* https://ifap.ed.gov/dpcletters/061908GEN0808.html (last visited Oct. 15, 2019) (emphasis added).
[5] *Id.*

- Income-Based Repayment ("IBR");

- Pay-As-You-Earn ("PAYE); and

- Revised Pay-As-You-Earn ("REPAYE").

(collectively "IDR Plans").

234.    As of March 2019, more than 7.8 million Direct Loan and FFEL borrowers were enrolled in IDR Plans.[6]

235.    IDR Plans have several qualities that make them attractive to student loan borrowers.

236.    For example, a borrower's monthly payment amount is based on his or her annual income and family size. The monthly payment amount is calculated as a percentage of his or her discretionary income and is capped at 10-20% of that income.[7] Discretionary income is determined by taking the difference between a borrower's adjusted gross income ("AGI") and 150% of the federal poverty guideline amount based on the borrower's family size and location.

237.    This adjusted payment is designed to provide a more affordable monthly payment than is available under the 10-year Standard Repayment Plan and may be as low as $0 per month.

238.    Certain plans (IBR and PAYE) are available only to borrowers with a "Partial Financial Hardship." A borrower has a Partial Financial Hardship when their annual payments under the 10-year Standard Repayment Plan exceed 10% (PAYE) or 15% (IBR) of the difference between their AGI and 150% of the poverty line for their family size.[8]

---

[6] News Release, Federal Student Aid an Office of the U.S. Department of Education, Federal Student Aid Posts New Reports to FSA Data Center (Aug. 7, 2019), *available at* https://ifap.ed.gov/eannouncements/080719FSAPostsNewReportsToFSADataCenter.html.
[7] 34 C.F.R. § 685.209(a)(1)(v) (PAYE); 34 C.F.R. § 685.209(b)(1)(ii) (ICR); 34 C.F.R. § 685.209(c)(2) (REPAYE); 34 C.F.R. § 685.221(a)(5) (IBR).
[8] 34 C.F.R. § 685.209(a)(1)(v) (PAYE); 34 C.F.R. § 685.221(a)(5) (IBR).

239.    Another benefit of IDR Plans is loan forgiveness (separate from the Public Service Loan Forgiveness Program). Each IDR plan forgives the outstanding balance on eligible loans after 20 or 25 years (depending on the plan) of qualifying repayment. Periods of forbearance, however, <u>do not </u>count towards the qualifying repayment period.

240.    Certain Plans (IBR, PAYE, and REPAYE) further provide for federal interest subsidy benefits. If a borrower's monthly payment amount does not cover the interest that accrues, the government will pay 100% of the outstanding interest on subsidized loans for the first three years the borrower begins repaying the loans under the plan. For REPAYE, the federal government additionally pays 50% of the outstanding interest on a borrower's unsubsidized loans for the first three years and 50% of the outstanding interest on subsidized loans after the first three years. The government does not pay accrued interest during periods for which the borrower receives an economic hardship deferment.[9]

241.    When borrowers enroll in an IDR plan, it is effective for a one-year period ("Annual Repayment Period"). To renew the plan for each subsequent year, borrowers must annually recertify their income level and family size.[10]

242.    Two to three months prior to the expiration of each Annual Repayment Period, the Department <u>must send</u> the borrower written notice of the annual deadline for recertifying their IDR plan eligibility.

243.    The notice must also include the consequences for failing to recertify within 10 days of the annual deadline, including a significant increase in monthly payments from a low affordable amount to the amount dictated by the Standard Repayment Plan, and the capitalization

[9] 34 C.F.R. § 685.209(a)(2)(iii).
[10] 34 C.F.R. § 685.209(a)(5)(i) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi) (ICR); 34 C.F.R. § 685.209(c)(4)(i)(REPAYE); 34 C.F.R. § 685.221(e)(1) (IBR).

of any accrued interest. In addition, the valuable federal interest subsidy benefit provided under the IBR, PAYE, and REPAYE plans is lost.

244.    When a borrower submits his or her annual paperwork to recertify their eligibility for an IDR Plan, the loan servicer must "promptly" determine the new monthly payment amount.[11] The Department has stated that the target turnaround time to process IDR applications and recertifications is approximately fifteen days.[12] And according to a July 20, 2016 policy direction memorandum on student loan servicing from then Under Secretary for the Department, Ted Mitchell, to James Runcie, Chief Operating Officer of Federal Student Aid ("FSA") (an Office of the U.S. Department of Education),[13] loan servicers should process IDR paperwork within 10 days.[14]

245.    Thus, the loan servicer has an affirmative duty to efficiently process the borrower's recertification materials to ensure smooth re-enrollment from one year to the next.

246.    While the loan servicer is processing a borrower's IDR renewal request, it "must maintain the borrower's current scheduled monthly payment amount" until the new payment amount is determined.[15]

---

[11] 34 C.F.R. § 685.209(a)(5)(viii)(a) (PAYE); 34 C.F.R. § 685.209(b)(3)(vi)(E)(1) (ICR); 34 C.F.R. § 685.209(c)(4)(viii)(a) (REPAYE); 34 C.F.R. §685.221(e)(8)(i) (IBR).

[12] Douglas-Gabriel, Danielle, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*, The Washington Post, April 5, 2016, *available at* http://wapo.st/2oAcgbJ (last visited Oct. 14, 2019) ("Officials at the department say the majority of servicers are meeting or exceeding the target turnaround time of 15 days. However, PHEAA, which primarily handles borrowers seeking public service loan forgiveness, has a significant backlog, according to the department.").

[13] According to the Department, FSA is a "performance-based organization." About Ed / Overview, U.S. Department of Education, last modified Oct. 17, 2017, *available at* https://www2.ed.gov/about/offices/list/fsa/index.html (last visited Nov. 7, 2019).

[14] Policy Memo from Ted Mitchell, Under Secretary, U.S. Department of Education, to James Runcie, Chief Operating Officer, Federal Student Aid, July 20, 2016, as updated October 17, 2016, 11, *available at* https://www.help.senate.gov/imo/media/doc/Servicing%20Recompete%20Policy%20Memo.pdf (last visited Oct. 14, 2019).

[15] 34 C.F.R. §685.221(e)(8)(ii).

247.    Regardless of which repayment plan a borrower is on, borrowers may change plans at any time during the repayment period. However, there may be harsh financial consequences for doing so. For instance, all outstanding interest is capitalized when changing from an IDR Plan to another plan.[16]

248.    For the IBR Plan, a borrower must also make one payment under the Standard Repayment Plan before switching to any other payment plan.[17] Because this payment amount is often unaffordable to borrowers, they can instead request a "reduced payment forbearance" and make a payment as low as $5.[18] However, any payments made during the "reduced payment forbearance," period do not count as a qualifying payment towards loan forgiveness.

### 3.  General and Administrative Forbearance

249.    Borrowers who cannot afford their monthly payments due to an economic hardship can seek relief by requesting a general forbearance. A general forbearance allows a borrower to temporarily stop making payments or to temporarily reduce his or her monthly payment amount for a specified period under certain circumstances such as financial hardship, poor health, or other acceptable reasons.[19]

250.    While a general forbearance may provide a borrower with temporary financial relief, it can be extremely costly in the long run. Any unpaid interest that accrues during the forbearance period is "capitalized," or added to the principal balance of the borrower's loan. Capitalization will therefore increase the principal balance and the total cost of the loan.

---

[16] 34 C.F.R. § 685.221(b)(4) (IBR); 34 C.F.R. § 685.209(a)(2)(iv)(A) (PAYE); 34 C.F.R. § 685.209(c)(2)(iv) (REPAYE).
[17] 34 C.F.R. § 685.221(d)(2)(ii).
[18] 34 C.F.R. § 685.205(a)
[19] 34 C.F.R. §685.205(a).

Furthermore, because borrowers temporarily cease making payments, forbearance delays the borrower's progress toward loan forgiveness.

251.    Loan servicers may also place a borrower's loans into "administrative forbearance" in certain circumstances without the borrower's approval, such as a period necessary to determine a borrower's eligibility for discharge due to bankruptcy, closed school, and other qualifying events, local or national emergencies, and instances of death or disability.

252.    Relevant to this case, a loan servicer may also grant an administrative forbearance for a period up to 60 days when additional time is needed to collect and process documents supporting a borrower's request to change repayment plans ("B-9 Forbearance").[20] Interest that accrues during a B-9 Forbearance period is not capitalized.

### 4.  Public Service Loan Forgiveness Program

253.    Publicly available data suggests that 1-in-4 U.S. workers are employed by a public service organization.[21] Many professions in this segment of the workforce require advanced levels of education, including classroom teachers, first responders, clinical social workers, and early childhood education providers. But the financial costs of these new credentials fall on individuals in careers with limited opportunity for wage growth to offset these costs.

254.    To address this problem, Congress established the Public Service Loan Forgiveness Program ("PSLF") in 2007 as part of the College Cost Reduction and Access Act ("CCRA") "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct Loans" after 10 years of

---

[20] 34 C.F.R. §685.205(b)(9).
[21] CFPB, Public Service & Student Debt: Analysis of Existing Benefits and Options for Public Service Organizations (Aug. 2013), *available at*
http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf.

service.[22] In other words, PSLF was designed "to ensure that nurses, teachers, first responders and other public servants can serve their communities without it being to their long-term financial detriment."[23]

255.    To qualify for PSLF, borrowers must:

- Have a qualifying loan, i.e. a Direct Loan or loans that are consolidated into the Direct Loan Program;

- Be enrolled in a qualifying repayment plan, such as an IDR plan or the Standard Repayment Plan;

- Be employed full-time by a "qualifying employer," such as public schools, emergency management, military, Federal, State, local, or Tribal government organization, agency or entity.[24]

- Make 120 on-time "qualifying payments." "Qualifying payments" must be for the "full scheduled installment amount" and made within 15 days of the scheduled due date.[25]

256.    Periods during which loans are in forbearance do not qualify towards loan forgiveness. Additionally, if a borrower consolidates his or her loans, they will lose credit for all previously made qualifying payments and must start accumulating qualifying payments from zero.

257.    In 2012, the Department awarded PHEAA an exclusive contract to manage the PSLF Program. When a borrower with loans serviced by another loan servicer expresses intent to satisfy the requirements for PSLF, that borrower's loan account is transferred from its current loan servicer to PHEAA. Borrowers participating in these programs therefore have no choice but to have their federal loans serviced by PHEAA.

---

[22] 34 C.F.R. §685.219(a).
[23] CFPB, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving their Communities* (June 22, 2017), https://www.consumerfinance.gov/data-research/research-reports/staying-track-while-giving-back-cost-student-loan-servicing-breakdowns-people-serving-their-communities/.
[24] 121 STAT. 801, Sec. 401(B); 34 C.F.R. §685.219(b)(1)(ii).
[25] 34 C.F.R. §685.219(1)(iii).

258.     Beginning January 2012, borrowers seeking loan forgiveness under the PSLF program may voluntarily submit an Employment Certification Form ("ECF"). According to the Department, the ECF Process allows borrowers to certify that their employment and payments qualify for the PSLF Program. Thus, borrowers can confirm their qualifying employment and receive an up-to-date count of PSLF qualifying payments to monitor their progress towards loan forgiveness.

259.     While Defendants recommend that borrowers submit ECFs annually, or when they change employers, borrowers are not required to do so.

260.     As the exclusive servicer of the PSLF Program, the Department relies on PHEAA to process ECFs.

261.     After completing 120 eligible monthly payments, borrowers may apply for loan forgiveness through a separate application. If a borrower submitted ECFs covering the entire period during which she made 120 qualifying payments, then she must submit "one additional" ECF to verify that she is employed full-time with a qualifying public service organization at the time she submits the application. If a borrower did not submit ECFs prior to completing her loan forgiveness application, or only submitted a portion of them, then she must provide all the remaining ECFs upon her application for loan forgiveness.

262.     If PHEAA determines that a borrower meets all of the requirements for forgiveness, it forwards the application to the Department for final review. If the Department agrees with PHEAA's determination, the Department directs PHEAA to forgive the remaining balance of the borrower's loans.

263.    In September 2017, ten years after borrowers who began making qualifying PSLF payments when the program came into effect in 2007 were first eligible for loan forgiveness under the PSLF Program in September 2017.

264.    Over 19,300 borrowers had submitted loan forgiveness applications as of April 2018; the Department approved only 55 of those applications – *less than 1%* of borrowers who applied.[26] Of the applications processed, over 40% were denied only because they had not yet made the 120 qualifying payments.

265.    After a public outcry over borrowers' inability to gain loan forgiveness under the PSLF Program, in 2018, Congress created an add-on program called Temporary Expanded Public Service Loan Forgiveness ("TEPSLF"). Under TEPSLF, borrowers who made some or all of their payments under a nonqualifying repayment plan may receive loan forgiveness. Congress set aside $700 million for the program available to borrowers on a first come, first serve basis.

266.    But the TEPSLF Program proved to be as big of a failure as PSLF itself. According to a review by the United States Government Accountability Office ("GAO"), approximately 54,000 TEPSLF applications were processed; *99% of those applications were rejected*.[27]

267.    As of June 2019, PHEAA had processed 102,051 PSLF applications; *only 1.2% were approved*. Of those applications, 55% were denied because they had not yet made the 120 qualifying payments; 15% were denied because they did not have Direct Loans.[28]

---

[26] U.S. Gov't Accountability Office, GAO-18-547, Public Service Loan Forgiveness: Education Needs to Provide Better Information for the Loan Servicer and Borrowers (Sept. 5, 2018) [hereinafter *September 2018 GAO Report*], *available at* https://www.gao.gov/assets/700/694304.pdf (emphasis added).

[27] U.S. Gov't Accountability Office, GAO-19-595, Public Service Loan Forgiveness: Improving the Temporary Expanded Process Could Help Reduce Borrower Confusion 11 (Sept. 5 2019) [hereinafter *September 2019 GAO Report*], *available at* https://www.gao.gov/assets/710/701157.pdf (emphasis added).

[28] Federal Student Aid, An Office of the U.S. Dept. of Education, June 2019 PSLF Report, *available at* https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data (last visited Oct. 14, 2019) (emphasis added).

### 5.   The TEACH Grant Program

268.   "The U.S. Department of Education estimates that our country will need approximately 430,000 new elementary and secondary teachers by the year 2020, particularly in high-need subject areas such as mathematics, science, and special education."[29]

269.   To attract and retain highly qualified teachers in high-need fields at low-income schools, Congress established the Teacher Education Assistance for College and Higher Education (TEACH) Grant program in 2007 under the CCRA.[30]

270.   The TEACH Grant Program provides financial grants up to $4,000 per academic year to eligible undergraduate, post-baccalaureate, and graduate students who are completing or plan to complete course work needed to begin a career in teaching.[31] Undergraduate students are eligible to receive a maximum of $16,000 in TEACH Grants, while graduate students are eligible for a maximum of $8,000 in TEACH Grants.[32]

271.   As of 2015, more than $593 million in TEACH Grants had been awarded since the start of the program in 2007.[33] Since then, from Award Year 2015 to Award Year 2018-2019 Q1, the federal government has disbursed an additional $330 million in TEACH Grants to 115,524 recipients.[34]

---

[29] U.S. Gov't Accountability Office, GAO-15-314, Higher Education: Better Management of Federal Grant and Loan Forgiveness Programs for Teachers Needed to Improve Participant Outcomes 1 (Feb. 24, 2015) [hereinafter *February 2015 GAO Report*] *available at* https://www.gao.gov/assets/670/668634.pdf.
[30] 20 U.S.C. § 1070g, *et seq.*
[31] 20 U.S.C. § 1070g-1(a)(1).
[32] 20 U.S.C. § 1070g-1(d).
[33] February 2015 GAO Report, at 8.
[34] Plaintiffs calculations are based on Department of Education, Title IV Program Volume Reports, Grant Volume, AY 2015-2016 (Award Year Summary), Q4; AY 2016-2017, Q4 (Award Year Summary); AY 2017-2018, Q4 (Award Year Summary); and AY 2018-2019, Q4 (Award Year Summary), *available at* https://studentaid.ed.gov/sa/about/data-center/student/title-iv (last visited Oct. 14, 2019).

272.    In exchange for each Grant, students must sign an Agreement to Serve with the Department that sets forth the recipients' rights and obligations under the TEACH Grant program.[35]

273.    By signing an Agreement to Serve, recipients agree to fulfill a service obligation that requires them to teach (i) full time, (ii) at a low-income school (*i.e.*, an elementary school, secondary school, or educational service agency that serves students from low-income families); (iii) in a high-need field (such as bilingual education and English language acquisition, foreign language, mathematics, reading specialist, science, and special education); [36] (iv) for a total of at least four school years within eight years after completing (or ceasing enrollment in) the course of study for which they received the Grant (the "Service Obligation"). [37]

274.    Additionally, recipients must "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[38]

275.    If a TEACH Grant recipient fails to satisfy the Service Obligation, that recipient's TEACH Grant may be converted to a Federal Direct Unsubsidized Loan that the recipient must pay back with capitalized interest accruing from the date the TEACH Grant was initially disbursed to that recipient ("TEACH Loan").[39]

276.    The TEACH Grant Program identifies five situations that permit the Department to convert a TEACH Grant to a TEACH Loan:

    a.    At the recipient's request;

---

[35] 20 U.S.C. § 1070g-2(b); 34 C.F.R. § 686.12(a).
[36] 20 U.S.C. § 1070g-2(b)(1)(C); 34 C.F.R. § 686.2(d).
[37] *See also* 20 U.S.C. § 1070g-2(b)(1); 34 C.F.R. § 686.12(b).
[38] 20 U.S.C.A. § 1070g-2(b)(1)(D).
[39] 34 C.F.R. § 686.43.

b.     The recipient ceased enrollment in the qualifying teaching program prior to completion but fails to timely notify the Department that he or she is meeting or intends to meet the Service Obligation;

c.     The recipient ceased enrollment in the qualifying teaching program prior to completion but has not been determined eligible for a suspension of the 8-year period for completing the Service Obligation, re-enrolled in a qualifying teaching program, or begun qualifying employment;

**_d._**     **_The recipient does not actively confirm to the Secretary, at least annually, his or her intention to satisfy the agreement to serve;" or_**

e.     The grant recipient failed to begin or maintain qualified employment within the timeframe that would allow that individual to complete the service obligation.[40]

277.   In 2013, the Department contracted with PHEAA to be the exclusive servicer of the TEACH Grant Program. As of June 30, 2015, PHEAA was servicing about $444.5 million in TEACH Grants.

278.   A February 2015 GAO report provided that in just a one-year period from August 2013 through September 2014, a remarkable 36,000 of the more than 112,000 TEACH Grants were converted to loans -- 2,252 were converted in error. The report noted, however, that **_"[t]he overall scope of the problem is unknown_**."[41]

279.   The GAO also reported that 64% of requests for assistance from the FSA Ombudsman "cited problems submitting annual certification paperwork."[42] "The more common challenges cited included recipients not receiving reminders that their paperwork was due – as the servicer is required to send – or asserting that their grant was converted through no fault of their own."[43]

---

[40] 34 C.F.R. § 686.43(a).
[41] February 2015 GAO Report, at 26-27.
[42] February 2015 GAO Report, at 21
[43] _Id_.

280.     The Department later reported in March 2018 that of those TEACH Grant

recipients whose grants were converted to loans and who reported the reason they did not certify

annually, 19.9% "forgot about annual certification," 44.0% "did not know about annual

certification or the process," and 30.7% "found the annual certification process challenging."[44]

---

**Exhibit A2.2d.  Percentage and standard error of the percentage of TEACH Grant recipients whose grants were converted to loans and who reported the reason they did not certify annually**

| Reason for not certifying annually | Percentage | SE |
|---|---|---|
| **Total** | **100.0** | — |
| I forgot about annual certification | 19.9 | 5.9 |
| I did not know about annual certification or the process | 44.0 | 9.0 |
| I elected not to certify | 0.0 | — |
| I found the annual certification process challenging | 30.7 | 8.7 |
| Other | 5.4 ! | 3.8 |

— = Not applicable.
**Note:** Data presented are weighted for sampling and nonresponse. Only recipients who indicated in a previous question that they did not certify annually were asked this question. SE = Standard error of the percentage.
**Source:** TEACH Grant Recipient Survey, 2016 (*n* = 40).

---

281.     In January 2019, the Department announced that certain TEACH Grant recipients

whose TEACH Grants were converted to TEACH Loans could request reconsideration of the

conversions by calling or emailing PHEAA and showing that they have met or are meeting the

requirements of the Service Obligation. PHEAA would then determine whether the recipient

qualifies to have his or her loans reconverted to a TEACH Grant.

282.     However, as alleged in this Complaint, the Reconsideration Process has failed to

adequately remedy the devastating financial consequences recipients suffered as a result of

Defendants' failures.

---

[44] American Institutes for Research, *Study of the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program*, 51 (March 2018), prepared for U.S. Dept. of Education: Office of Planning, Evaluation and Policy Development Policy and Program Studies Service, *available at* https://www2.ed.gov/rschstat/eval/highered/teach-grant/final-report.pdf (last visited Oct. 14, 2019).

**B.      PHEAA's Contract with The Department to Service Federal Student Loans and Teach Grants**

283.      In 2009, the Department awarded PHEAA and three other for-profit loan servicers a servicing contract for an initial term of five years. These four companies are referred to as the Title IV Additional Servicer entities, or "TIVAS Entities."

284.      As of September 30, 2018, PHEAA was the largest servicer of federally owned student loans in the United States, according to data from the Department's National Student Loan Data System ("NSLDS").

285.      Student loan servicers are a crucial link between borrowers and lenders. Common loan servicing activities include:

- Providing required disclosures to borrowers about various Direct Loan terms and conditions during repayment;

- Providing information to borrowers on the several repayment plan options, such as the Standard Repayment Plan and the various IDR Plans;

- Providing information to borrowers about loan cancellation, discharge, and forgiveness benefits;

- Processing applications for enrollment in a borrower's selected repayment plan, calculating the amount of monthly payments, and sending occasional communications to borrowers regarding their selected repayment plans;

- Recertifying borrower eligibility for IDR Plans and recalculating monthly payments based on borrower income and family size information provided during the annual recertification process;

- Processing applications for loan forgiveness benefits, including benefits offered under the Public Service Loan Forgiveness Program;

- Collecting and applying loan payments to outstanding balances; and

- Providing delinquency and default prevention activities.[45]

---

[45] Congressional Research Service Report, *Administration of the William D. Ford Federal Direct Loan Program*, May 11, 2017, prepared for Members and Committees of Congress, *available at* https://www.everycrsreport.com/files/20170511_R44845_042ef4643defb8ff20cb2ab457af085a0479de60.pdf (last visited Oct. 14, 2019).

286.     As the exclusive loan servicer for the TEACH Grant and PSLF Programs,

PHEAA provides additional services with respect to the administration of those programs,

including:

- Processing TEACH Grant annual certification paperwork;

- Processing PSLF Employment Certification Forms; and

- Processing applications for forgiveness under PSLF.

287.     The Department renegotiated the terms of PHEAA's contract, as well as the other

TIVAS Entities' contracts, in 2014 and extended its terms until June 2019. According to the

Department's August 29, 2014 press release, the renegotiated contracts are intended to benefit

borrowers:

> As a result of President Obama's executive actions to help make
> student loans more affordable, the U.S. Department of Education
> has announced several new steps *to help federal student loan
> borrowers better manage their student debt*. … the Department has
> renegotiated the terms of its contracts with federal student loan
> servicers in order to strengthen incentives for them *to provide
> excellent customer service and help borrowers* stay up-to-date on
> their payments. This action will *help ensure that borrowers receive
> the highest quality support* as they repay their federal student loans
> and help the Department better monitor the performance of loan
> servicers to help them continue to improve.
>
> ***
>
> The renegotiated terms of the federal student loan servicer contracts
> are structured to create additional incentives for servicers to focus
> on the Department's priorities: *effective counseling and outreach
> to ensure borrowers select the best repayment option for them, and
> enhanced customer satisfaction for student and parent borrowers*
> at all stages of the student loan life cycle.[46]

---

[46]Press Release, U.S. Dept. of Education, U.S. Department of Education Strengthens Federal Student Loan
Servicing, Aug. 29, 2014, *available at* https://www.ed.gov/news/press-releases/us-department-education-
strengthens-federal-student-loan-servicing (last visited Oct. 14, 2019) (emphasis added).

288.     At all times, PHEAA's contract with the Department was premised on its obligation to "maintain[] a full understanding of all federal and state laws and regulations and FSA requirements"[47] and "ensure[] that all aspects of the service continue to remain in compliance as changes occur."[48] PHEAA is obligated to maintain "procedures and systems" that "shall include a system of internal controls that ensures resource use is consistent with laws, regulations and policies."[49]

289.     The importance of PHEAA's compliance with governing law is underscored by the contract's prohibition of PHEAA from billing the government for loans that have not been "serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (i.e. correct interest calculations, correct balances, interest determinations and calculations, notices sent properly, proper due diligence, etc.)."[50]

290.     As with all federal loan servicers, PHEAA's contract is a performance-based contract intended to promote competition among loan servicers and provide the "best of business services" to borrowers. The Department "expects [PHEAA] to provide commercially available services that will yield high performing portfolios and high levels of customer satisfaction."[51]

291.     The Department seeks to achieve the effective use of its performance-based contracts, in part, by establishing a common pricing schedule whereby PHEAA receives a per-unit fee for each loan that it administers. The amount of the fee depends on the status of the loan and the total volume of loans in that status category.

292.     The 2009 common pricing structure is set forth below:

---

[47] 2009 Contract, at 20, Paragraph C.1.4.3.
[48] Id.
[49] 2009 Contract, Attachment A-1.
[50] 2009 Contract, Addendum 1, p. 12.
[51] 2009 Contract, Attachment A-1, p.3.

| STATUS | VOLUME LOW | VOLUME HIGH | UNIT PRICE |
|---|---|---|---|
| **Borrowers in in-school status** | N/A | N/A | $ 1.050 |
| ***Borrowers in grace or current repayment status*** | ***1*** | ***3,000,000*** | ***$ 2.110*** |
| | 3,000,001 | UP | $ 1.900 |
| **Borrowers in deferment or forbearance** | 1 | 1,600,000 | $ 2.070 |
| | 1,600,000 | UP | $ 1.730 |
| **Borrowers 31-90 days delinquent** | N/A | N/A | $ 1.620 |
| **Borrowers 91-150 days delinquent** | N/A | N/A | $ 1.500 |
| **Borrowers 151-270 days delinquent** | N/A | N/A | $ 1.370 |
| **Borrowers 270+ days delinquent** | N/A | N/A | $ 0.500 |

293.     Under this fee structure, PHEAA is compensated only for those loans that remain in its portfolio. When the balance on a loan account is forgiven pursuant to an IDR plan or PSLF, that loan account is removed from PHEAA's portfolio and PHEAA no longer receives compensation for that account.

294.     The Department's common pricing structure was revised as of September 1, 2014 as follows:

| STATUS | UNIT | UNIT MEASURE | UNIT RATE |
|---|---|---|---|
| **In School** | 1+ | EA | $1.05 |
| **In Grace** | 1+ | EA | $1.68 |
| *In Repayment* | *1+* | *EA* | *$2.85* |
| **Service Member** | 1+ | EA | $2.85 |
| **Deferment** | 1+ | EA | $1.68 |
| *Forbearance* | *1+* | *EA* | *$1.05* |
| **Delinquent 6-30 days** | 1+ | EA | $2.11 |
| **Delinquent 31-90 days** | 1+ | EA | $1.46 |
| **Delinquent 91-150 days** | 1+ | EA | $1.35 |
| **Delinquent 151-270 days** | 1+ | EA | $1.23 |
| **Delinquent 271-360 days** | 1+ | EA | $0.45 |
| **Delinquent 361 or more Days** | 1+ | EA | $0.45 |
| **Delinquency Reduction Compensation Program** | N/A | N/A | Not-to-Exceed $2,000,000 |
| **Cohort Default Rate (CDR) Challenge Support** | | | |
| **Institution** | 1+ | EA | $213.00 |
| **Borrower** | 1+ | EA | $23.00 |
| **Loan Consolidation** | | | |
| **One-Time Development Cost** | N/A | N/A | Not-to-Exceed $1,200,000 |
| **Consolidations Completed** | 1+ | EA | $27.35 |

| | | | |
|---|---|---|---|
| **CDR Assistance Pilot (rate per school assisted)** | 1+ | EA | $18,000 |
| *Public Service Loan Forgiveness (PSLF)* | | | |
| *Approved Employment Certification Form* | *1+* | *EA* | *$5.00* |
| *Denied Employment Certification Form* | *1+* | *EA* | *$2.50* |
| *Borrowers in TEACH Grant Status* | *1+* | *EA* | *$1.05* |

295.     PHEAA's loan servicing contract with the Department also requires PHEAA to deploy "best of business practices"[52] Although the contract does not specifically define "best of business practices," the Department looks to best practices employed in servicing other forms of consumer debt, including the mortgage industry.

296.     As Defendant Secretary DeVos has stated, the Department must "ensure that the services [the Department] deliver are on par with those of world-class financial firms and world-class customer experiences."[53]

297.     Likewise, an interagency Presidential Task Force consisting of the Department, Office of Management and Budget, Department of the Treasury, and Domestic Policy Council appointed in 2015 to specifically recommend best practices for federal student loan servicers

---

[52] 2009 Contract, Attachment A1 at 3 and Attachment A-2 at 3.
[53] Press Release, U.S. Dept. of Education, *Prepared Remarks by U.S. Secretary of Education Betsy DeVos to Federal Student Aid's Training Conference*, November 27, 2018, *available at* https://www.ed.gov/news/speeches/prepared-remarks-us-secretary-education-betsy-devos-federal-student-aids-training-conference (last visited Oct. 14, 2019).

("Presidential Task Force"), based its recommendations, in part, on its discussions with mortgage lenders, servicers, and mortgage industry experts.

298.    As discussed in this Complaint, Defendants' loan servicing activities have fallen far short of industry best practices.

**C.    PHEAA's Fiduciary Role as a Consumer Advocate for Borrowers**

### 1.  The Department Delegates Advisory Duties to PHEAA

299.    Given the complexity of the FFEL and Direct Loan Programs, an important responsibility of PHEAA and other loan servicers is to provide borrowers with the necessary information to best manage their loans and assist them in making decisions throughout the life of their loan(s). As the Department of the Treasury acknowledged

> [t]he natural consequence of th[e] complexity [of the federal student loan system] is that it is difficult for borrowers, even those who are sophisticated, to navigate the program and effectively manage their repayment responsibilities. Because the program is difficult to understand, ***borrowers rely on servicers*** to answer questions about repayment, enroll borrowers in an appropriate and sustainable repayment plan, and assist borrowers when they struggle to make their payments."[54]

300.    In authorizing the Department to contract with third parties like PHEAA to service and administer federal student loan programs, Congress intended for loan servicers to serve in a unique advisory capacity in the best interest of borrowers that far exceed the role of conventional loan servicers. Unlike federal student loan servicers, traditional loan servicers do not service loans with an expansive array of complex repayment options and loan forgiveness programs.

---

[54] U.S. Dept. of the Treasury, A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation ("July 2018 Treasury Report") at p. 124 (July 2018), *available at* https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf (emphasis added).

301.     This Congressional intent is reflected in the structure of the Department and PHEAA's performance-based loan servicing contract. For example, in allocating loan servicing volume to PHEAA, the Department contractually reserves its "right to equitably introduce, eliminate, or modify loan deliverables/status items that are *in the best interest of the … Borrower*" and its "right to unilaterally shift borrowers [among loan servicers] *in the best interest of … Borrowers.*"[55]

302.     When the Department renegotiated the terms of PHEAA and other loan servicers' contracts in 2014, it further emphasized that the new terms are structured "to create additional incentives for servicers to focus on the Department's priorities: *effective counseling and outreach to ensure borrowers select the best repayment option for them*."[56]

303.     When borrowers enter repayment, the Department directs loan servicers to "[e]stablish a relationship with the borrower"[57] and "discuss the appropriate repayment plan … [and] consolidation options;"[58] they also must "[e]ducate and inform borrowers regarding the tools and options available to assist them in the management of their student loans."[59] Borrowers are encouraged to "[c]all the servicer to obtain information on repayment options that best meet the borrower's financial situation" and should "[u]nderstand that servicers are there to help.").[60]

---

[55] 2009 Contract, at 14 (emphasis added).

[56] Press Release, U.S. Dept. of Education, U.S. Department of Education Strengthens Federal Student Loan Servicing (August 29, 2014), *available at* https://www.ed.gov/news/press-releases/us-department-education-strengthens-federal-student-loan-servicing (last visited Oct. 15, 2019) (emphasis added).

[57] Mary Oknich and Sue O'Flaherty, *Loan Repayment Options: What You Need to Know*, U.S. Dept. of Education, 10 (July 2012), *available at* https://ifap.ed.gov/presentations/attachments/NASFAA2012LoanRepaymentOptionsWhatYouNeedtoKnow.ppt (last visited Oct. 15, 2019) (emphasis added).

[58] Mary Oknich and Sue O'Flaherty, *Loan Servicing Update*, U.S. Dept. of Education, 29 (July 2012), *available at* https://ifap.ed.gov/presentations/attachments/NASFAA2012LoanRepaymentOptionsWhatYouNeedtoKnow.ppt (last visited Oct. 15, 2019) (emphasis added).

[59] Sue O'Flaherty, *Federal Loan Servicer Panel Discussion*, Federal Student Aid: An Office of the U.S. Dept. of Education, 5 (Nov. 2012), *available at* https://ifap.ed.gov/presentations/attachments/2012FSAConfSession14FederalLoanServicerPanelDiscussion.ppt (last visited Oct. 15, 2019) (emphasis added).

[60] Loan Servicing Update, 26.

304.     In fact, the Department refers to its loan servicer system as a "borrower-centric" approach" intended to "serve borrowers."[61] The Department also routinely refers to loan servicers as advisers who can provide advice on repayment options and other resources:

- Student loan servicers "are responsible for *... **advising borrowers*** on resources and benefits to better manage their federal student loan obligations …."[62]

- "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will ***help you decide*** whether one of these plans is right for you."[63]

305.     The Department also directs borrowers to seek "help" and "assistance" from their loan servicer for everything from payment plans to loan forgiveness:

- "***The loan servicer will work with you*** on repayment plans and loan consolidation and ***will assist you*** with other tasks related to your federal student loan.[64]

- "If you need help with this [IDR Request] form, contact your loan holder or servicer for free assistance."[65]

- "It is important to maintain contact with your loan servicer. If your circumstances change at any time during your repayment period, your loan servicer will be able to help."[66]

306.     Making loan servicers available to help borrowers manage their loans is such an important objective for the Department, that the Department emphasizes that a borrower's loan servicer should be their first and only source for help. In a black box prominently displayed on FSA's website, the Department states:[67]

---

[61] Loan Servicing Update, 18, 19 (emphasis added).

[62] *Loan Servicing Contracts*, FSA, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing. (emphasis added).

[63] *Income Driven Repayment Plans*, FSA, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[64] *Loan Servicers*, FSA, https://studentaid.ed.gov/sa/repay-loans/understand/servicers. (Emphasis added)

[65] A copy of the Income-Driven Repayment (IDR) Plan Request Form can be found at: https://static.studentloans.gov/images/idrPreview.pdf.

[66] A loan servicer will help you manage the repayment of your federal student loans—for free, FSA, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/servicers

[67] *Income Driven Repayment Plans*, FSA, https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven. (emphasis added).

> Why pay for help with your federal student loans when your loan servicer will help you for FREE? Contact your servicer to apply for income-driven repayment plans, student loan forgiveness, and more.

307.  An FSA Q&A similarly states:

> What should I do if I am contacted by someone who wants to charge me fees to consolidate my federal student loans or to apply for an income-based repayment plan?
>
> Contact your federal loan servicer; these services and more can be completed by your servicer for free! If you are contacted by a company asking you to pay "enrollment," "subscription," or "maintenance" fees to enroll you in a federal repayment plan or forgiveness program, you should walk away.[68]

308.  Similarly, the official blog of the Department published an article entitled, "Don't Be Fooled: You Never Have to Pay for Student Loan Help." In the article, the Department boasts:

> You *never* need to pay for help with your student loans. **For the great price of *free***, the U.S. Department of Education can help you:
>
> - Lower Monthly Payments
>
> - Consolidate Federal Student Loans
>
> - Check on Loan Forgiveness; and
>
> - Get Out of Default
>
> Your loan servicer … can also help you with these goals for free.[69]

---

[69] Ted Mitchell, *Don't Be Fooled: You Never Have to Pay for Student Loan Help*, HomeRoom: The Official Blog of the U.S. Dept. of Education, Jan. 29, 2016, *available at* https://blog.ed.gov/2016/01/dont-be-fooled-you-never-have-to-pay-for-student-loan-help/ (last visited Oct. 15 2019) (emphasis in original).

## 2.  PHEAA Holds Itself Out as an Advisor

309.    PHEAA, too, represents itself as an advisor, available to offer assistance and advice to borrowers, particularly in relation to payment plan and loan forgiveness options. In fact, PHEAA refers to its call center representatives as "Loan Counselors."

310.    In addition to the advisory services provided by PHEAA's Loan Counselors, PHEAA maintains an "Office of Consumer Advocacy," whose stated mission is: to "***provide[] assistance to consumers with problems and concerns related to their student loans*** and "***listen to and investigate your concerns, and serve as your liaison with PHEAA operational staff regarding your issue***."[70] It instructs borrowers to be "transparent about your concerns and your situation ***so that we may best serve your needs.***"[71]

## D.    The Department's Oversight of Federal Student Loans and Student Loan Servicers

311.    Congress created the Department as a cabinet-level department in 1979 to oversee federal education programs because education "is too important to be mismanaged or denigrated within the federal government structure."[72] The Department's role includes "guaranteeing equal access to educational opportunities" and "maintaining significant higher education loan and grant programs to open doors for all students desiring to continue their education beyond public school."[73]

312.    The Department's founding purposes include:

> "[T]o strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual;"[74]
>
> ****

---

[70]  PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last visited Oct. 15, 2019).
[71] *Id*. (emphasis added).
[72] S. Rep. No. 96-49 (1979).
[73] *Id*.
[74] 20 U.S.C. § 3402(1).

"[T]o improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds; . . ."[75]

\*\*\*\*\*

"[T]o increase the accountability of Federal education programs to the President, the Congress, and the public."[76]

313.   Today, the Department is one of the world's largest lenders, with a "consumer loan portfolio . . . larger than [that of] J.P. Morgan and Bank of America."[77] As of 2018, the Department's assets totaled $1.328 billion, over 90% of which is student loan receivables under the FFEL and Direct Loan Programs.[78]

314.   The Department receives oversight authority and obligations from three distinct sources: 1) Congressional statutes establishing Title IV programs, 2) contractual relationships with Title IV servicers, and 3) Federal Internal Control Standards.

315.   The Department established the FSA[79] to manage the administrative and oversight functions supporting the federal student financial aid programs, including the TEACH Grant Program, the FFEL Loan Program, and the Direct Loan and PSLF Programs.[80] The Congressional mandated purposes of FSA include:

---

[75] 20 U.S.C. § 3402(6).
[76] 20 U.S.C. § 3402(7).
[77] Betsy DeVos, U.S. Sec'y of Education, *Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the House Comm. on Educ. and Labor,* Statement Before the Committee on Education and Labor, 116th Cong. 5 (Apr. 10, 2019) *available at,*
https://edlabor.house.gov/imo/media/doc/SecretaryDeVosTestimony041019.pdf (last visited Oct. 17, 2019).
[78] *See* U.S. Dep't of Educ., *FY2018 Agency Financial Report* 9 (Nov. 15, 2018), *available at* https://www2.ed.gov/about/reports/annual/2018report/agency-financial-report.pdf (hereinafter "DOE, *FY2018 Agency Financial Report*") (last visited Oct. 17, 2019).
[79] In the 1990s, the GAO designated FSA as a "high-risk agency with longstanding management problems." Then in 1998, to improve the efficiency and effectiveness of FSA and to mitigate the mishandling of limited resources moving forward, Congress converted it to a performance-based organization that would have to meet specific objectives under the HEA. *See Federal Student Aid: Performance-Based Organiza-tion Review: Joint Hearing Before the Subcomm. on Gov't Operations of the Comm. on Oversight and Gov't Reform*, 114th Cong. 5 (Nov. 18, 2015) (statement of Hon. Virginia Foxx, Chairwoman of the Subcomm. on Higher Educ. and Workforce Training).
[80] 20 U.S.C.A. § 1018

(A)      to improve service to students and other participants in [federal] student financial assistance programs…, including making those programs more understandable to students and their parents;

\*\*\*

(C)      to increase the accountability of the officials responsible for administering the operational aspects of these programs;

\*\*\*

(G)      to develop and maintain a student financial assistance system that contains complete, accurate, and timely data to ensure program integrity.[81]

316.     FSA administers the Title IV programs, in part, through PHEAA and other loan servicers. In fact, Congress requires the Department to enter into loan servicing contracts, to the extent practicable, for the Direct Loan Program and PSLF, and grants authority to contract for "such other aspects of the direct student loan program as the Secretary determines are necessary to ensure the successful operation of the program."[82] Similarly, the HEA authorizes the Department to contract with third parties or otherwise delegate to third parties any of the Department's functions concerning the FFEL Program.[83]

317.     Currently, the Department contracts with nine federal student loan servicers to manage its approximately $1.5 trillion student loan portfolio.[84]

318.     In contracting with third parties to perform servicing and other administrative functions for the Title IV Programs, however, "FSA is responsible for ensuring servicers comply with all requirements for servicing federally held student loans, including requirements relevant to income-driven repayment plan, forbearance and deferments of loan payments, consolidation

---

[81] *Id*.
[82] 20 U.S.C. 1087f(b)(4).
[83] 20 U.S.C. 1086(a).
[84] *September 2018 GAO Report*, at 3; *see also* Post-secondary National Policy Institute, *Issue Primers, Federal Student Loan Servicers* Fig. 7 (Mar. 8, 2019), http://pnpi.org/federal-student-loan-servicing/ (last visited Oct. 17, 2019).

of loans, and principal and interest payments."[85] The Department, however, maintains ultimate responsibility for the performance of the operational processes of its loan servicers.[86] Indeed, the Department has admitted that "the Department has the ultimate authority to review [PHEAA's] actions under its contract."[87]

319.   Part of the Department's obligations in overseeing PHEAA and other student loan servicers is to provide clear, sufficient and consistent guidance and conduct monitoring activities. According to a July 27, 2018 GAO Report:

> In administering the Direct Loan program, Education uses numerous approaches to oversee the performance of its contractors, including issuing instructions and guidance to loan servicers. In addition to providing written communications, Education meets with servicers to discuss program operations and policy. Education also conducts various monitoring activities, including monitoring selected calls between servicers and Direct Loan borrowers to help ensure both acceptable customer service and servicer compliance with statutory, regulatory, and contractual requirements.[88]

320.   The loan servicing contracts similarly identify the types of oversight responsibilities of the Department to ensure loan servicers comply with the requirements of their contracts, including PHEAA's obligation to "provide [FSA] the ability to monitor phone calls remotely," "support quarterly  monitoring reviews completed by FSA," and "support annual program compliance reviews done by FSA, or by an agent of FSA."[89] Secretary DeVos has

---

[85] Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans, U.S. DEPARTMENT OF EDUCATION OFFICE OF INSPECTOR GENERAL (February 12, 2019), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2019/a05q0008.pdf.
[86] Standards for Internal Control in the Federal Government ("Internal Standards"), Section OV4.01, p. 17 (Sept. 2014).
[87] Answer at ¶ 66, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, No. 16-2476 (D.D.C.), ECF No. 14.
[88] U.S. Gov't Accountability Office, GAO-18-587R, Federal Student Loans: Further Actions Needed to Implement Recommendations on Oversight of Loan Servicers 2 (July 2018) [hereinafter *July 2018 GAO Report*], *available at* https://www.gao.gov/assets/700/693475.pdf.
[89] 2009 Contract, A-2 at 11.

assured Congress that the Department "will continue to monitor the servicers to make sure they are upholding the agreements they have made on behalf of the students."[90]

321.    When a loan servicer falls out of compliance with its servicing obligations, including failure to properly calculate interest and send proper notice, the Department has two primary enforcement tools: (1) nonpayment of loan servicing fees, and (2) reallocation of loan volume to another loan servicer.

322.    According to PHEAA's contract, PHEAA may not bill the Department for any loan that is not serviced in compliance with the requirements of the contract:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.) will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.[91]

323.    PHEAA's contract further provides that the Department may reallocate the volume of loans serviced by PHEAA to another loan servicer:

> If a servicer is out of compliance …, that servicer's new volume may be re-allocated to one or more other servicers until compliance has been achieved. In addition, that servicer's current account volume may be transferred to another servicer, at the non-compliant servicer's expense.[92]

324.    As alleged in this Complaint, however, the Department was well aware of PHEAA's non-compliance, but failed to impose these penalties and hold PHEAA accountable for its widespread and pervasive instances of non-compliance.

---

[90] Examining Policies and Priorities of the U.S. Dep't of Educ.: Hearing Before the H. Comm. on Educ. And Labor, 116th Cong. (April 10, 2019) at 00:37:38 (testimony of Elisabeth DeVos, Secretary of Education).
[91] 2009 Contract, at 12.
[92] Contact, Attachment A-4, page 2-3.

325.    The Department is also obligated to follow Federal Internal Control Standards, ("Internal Standards"), that apply to all federal executive agencies.[93] As with other statutory requirements, the purpose of these standards is to ensure that an entity's objectives will be achieved.[94] Apart from establishing internal control policies and procedures, the Internal Standards set out clear guidance that federal entities must follow to ensure the entity objectives are achieved, including guidance on assessing risks, information control, communication, compliance with federal guidelines, and remediation of deficiencies in any area of internal control.

326.    For example, agency management must ensure "compliance with applicable laws and regulations,"[95] actively "evaluate[s] and document[s] the results of ongoing monitoring…to identify internal control issues,"[96] "evaluate performance and hold individuals accountable for their internal control responsibilities,"[97] and "remediate identified internal control deficiencies on a timely basis."[98]

327.    As part of its internal monitoring processes, the Department "may contract with service organizations to perform roles in the organizational structure," however, the Department must:

> …communicate to the service organization the objectives of the entity and their related risks, the entity's standards of conduct, the role of the service organization in the organizational structure, the assigned responsibilities and authorities of the role, and the expectations of competence for its role that will enable the service organization to perform its internal control responsibilities.[99]

---

[93] 31 U.S.C. § 3512(b). Also known as the "Federal Managers' Financial Integrity Act (FMFIA)."
[94] Internal Standards, at 5
[95] *Id.* at 12.
[96] *Id.* at 20.
[97] *Id.* at 21.
[98] *Id.* at 64.
[99] *Id.* at 32.

328.     Further, when the Department, through its oversight functions, learns of a deficiency, it must "take[] corrective action as necessary to enforce accountability for internal control in the entity."[100]

329.     When the Department learns of a deficiency, whether through its oversight functions or through external audits, it must,

> Complete[] and document[] corrective actions to remediate internal control deficiencies on a timely basis. These corrective actions include resolution of audit findings…The audit resolution process begins when audit or other review results are reported to management, and is completed only after action has been taken that (1) corrects identified deficiencies, (2) produces improvements, or (3) demonstrates that the findings and recommendations do not warrant management action.[101]

330.     Additionally, Internal Standards also require that:

> Depending on the entity's regulatory or compliance requirements, the entity may also be required to report issues externally to appropriate external parties, such as the legislators, regulators, and standard-setting bodies that establish laws, rules, regulations, and standards to which the entity is subject.[102]

331.     In addition to its oversight responsibilities, Internal Standards dictate how an entity must communicate, both internally and externally with contractors and the general public. For example, Internal Standards require the Department to communicate with borrowers in a way to effectively achieve the objectives and purposes of Title IV financial aid programs.[103]

332.     The Department has failed to administer the federal loan and forgiveness programs consistent with its obligations under Federal Internal Control Standards.

---

[100] *Id.* at 32-33.
[101] *Id.* at 68-69.
[102] *Id.* at 68.
[103] *Id.* at 62 ("Management should externally communicate the necessary quality information to achieve the entity's objectives.").

## CLASS ACTION ALLEGATIONS

333.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of themselves and as representatives of the following Classes:

### TEACH Class

All persons in the United States who received a TEACH Grant serviced by PHEAA and who submitted documentation demonstrating that they either 1) are fulfilling their obligation; or 2) have fulfilled their obligation, yet had their grant converted to an interest-bearing loan from January 1, 2009 to present (the "Class Period").

### IDR Class:

All individuals who are student loan borrowers from the federal government and who had at least one federal loan serviced by PHEAA and/or any of its assumed names between January 1, 2009 and the present (the "Class Period") whose accounts PHEAA placed into forbearance and were damaged as a result.

### PSLF Class:

All individuals who are student loan borrowers from the federal government and who had at least one federal loan serviced by PHEAA and/or any of its assumed names between January 1, 2009 and the present (the "Class Period") who were enrolled or intended to enroll in the Public Service Loan Forgiveness Program and who did not have their qualifying payments accurately counted by PHEAA and were damaged as a result.[104]

334.    Excluded from the Classes are Defendants and their past and present officers,

directors, management, employees, subsidiaries or affiliates, any Judge to whom this action is

assigned and any member of such Judge's staff and immediate family, any attorneys who enter

their appearance in this action, and governmental entities not named in this lawsuit.

335.    Members of the classes are so numerous and geographically dispersed that joinder

is impracticable. Plaintiffs believe there are thousands of members of the Classes, if not more.

---

[104] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, the Class Period.

Further, the Classes are readily identifiable by objective means from information and records maintained by PHEAA.

336.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct of PHEAA. Plaintiffs' claims and claims of the putative Classes originate from the same fraudulent and unfair practices. If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs would fairly and adequately protect the interests of the members of the putative class.

337.   PHEAA acted on grounds generally applicable to the entire Classes, therefore injunctive relief is appropriate. Such generally applicable conduct is inherent in PHEAA's wrongful conduct.

338.   Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members. Questions of law and fact common to the Classes include but are not limited to:

a.   Whether PHEAA has a common and pervasive practice of improperly converting TEACH Grants into interest-bearing federal Direct Loans;

b.   Whether PHEAA has a common and pervasive practice of misprocessing, delaying, and obstructing enrollment and recertification of IDR Plans;

c.   Whether PHEAA's misconduct caused injuries to Plaintiffs and the Class by causing the improper capitalization of interest, and additional payments towards the payoff of loans and loan forgiveness;

d.   Whether PHEAA as a consumer advocate owed a fiduciary duty to borrowers;

e.   Whether PHEAA's misconduct violates the Racketeer Influenced Corrupt Organizations Act;

f.   Whether PHEAA's misconduct constitutes unjust enrichment;

g.      Whether PHEAA's misconduct violates state consumer protection statutes;

h.      Whether PHEAA's misconduct entitles Plaintiffs and the Classes to recover compensatory, statutory, treble, and/or putative damages;

i.      Whether PHEAA acted as an agent of the Department of Education;

j.      Whether PHEAA breached its contract with the Department of Education;

k.      Whether Plaintiffs and the proposed Classes were third-party beneficiaries of the contract between PHEAA and the Department of Education;

l.      Whether Plaintiffs and the Classes are entitled to injunctive relief enjoining PHEAA from further engaging in unfair and deceptive practices alleged herein; and

m.      Whether Plaintiffs and the putative Classes are entitled to recover attorney's fees.

339.    These and other questions of law and fact are common to the Classes and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

340.    PHEAA's conduct was generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

341.    This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise could not afford to litigate the claim, such as those asserted herein. Prosecution as a class action will eliminate the possibility of repetitive litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would produce.

342.    The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for PHEAA.

343.    Class action treatment also is superior to any alternative method to compensate the victims of PHEAA's unlawful conduct—Plaintiffs and the proposed Classes—for the injuries they have suffered as a direct result of Defendant PHEAA's conduct.

## CLAIMS FOR RELIEF

### COUNT I – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A),
**Agency Action that is Arbitrary and Capricious, an Abuse of Discretion
or Not in Accordance With Law (TEACH Grant Program),**

**(Against the Department and Secretary DeVos)**

344.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

345.    This count is brought on behalf of the TEACH Plaintiffs and members of the TEACH Class against the Department of Education.

346.    The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

347.    The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

a. Failing to seek OMB approval for the annual TEACH Grant Certification form as required by The Paperwork Reduction Act, 44 U.S.C. § 3506(c);[105]

b. Subjecting TEACH Plaintiffs and members of the TEACH Class to penalties, as prohibited by The Paperwork Reduction Act, 44 U.S.C. § 3512(a), by converting recipients' TEACH Grants to TEACH Loans for failure to submit a completed annual TEACH Grant Certification form, or for submitting a TEACH Grant Certification form that contained what the Department arbitrarily determined to be errors;

c. Failing to submit to Congress every two years beginning in 2010, a report on "TEACH grants with respect to the schools and students served by recipients of such grants," as mandated by 20 U.S.C.A. § 1070g-4;

d. Converting eligible TEACH Plaintiffs' and members of the TEACH Class' TEACH Grants to TEACH Loans:

      i. without sufficiently communicating the requirements of the TEACH Grant program to recipients, as required by Principle 15 of the Federal Internal Control Standards;

      ii. without providing proper notice of the annual TEACH Grant certification deadline, as required by Principle 15 of the Federal Internal Control Standards;

      iii. due to hyper-technical "mistakes" on completed certification forms without allowing TEACH Plaintiffs and members of the TEACH Class time to correct deficiencies;

      iv. without providing the required amount of time after notice of the annual certification deadline to submit the TEACH Grant Certification form; and

      v. for reasons not authorized by 20 U.S.C. § 1070g-2(c) and 34 C.F.R. § 686.43.

---

[105] 44 U.S.C. § 3506; 5 C.F.R. § 1320.5.

e.      Denying applications for reconsideration of eligible TEACH Plaintiffs and members of the TEACH Class pursuant to the TEACH Grant Reconsideration Process;

f.      Denying TEACH Plaintiffs and members of the TEACH Class whose application for reconsideration were granted, with credit and/or a refund for (i) accrued, but unpaid, interest on TEACH Loans and (ii) payments of principal and interest made towards TEACH Loans;

g.      Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

h.      Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

i.      Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards.

j.      Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards;

348.    The Department's actions collectively, constitute a long-standing pattern of failing to administer the TEACH Grant Program in a manner that furthers the important policy and goals of the HEA and TEACH Grant Program which constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

349.    The Department's actions constitute final agency actions.

350.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

351.    Accordingly, the Department's actions should be set aside. Plaintiffs request an order requiring the Department to (i) reconvert TEACH Plaintiffs' and members of the TEACH Class's TEACH Loans back to TEACH Grants, (ii) provide credit for all accrued but unpaid interest, (iii) provide a credit or refund for payments of principal and interest made towards the TEACH Loans.

## COUNT II – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A),
### Agency Action that is Arbitrary and Capricious,
### an Abuse of Discretion or Not in Accordance with Law (IDR Plans)

### (Against the Department and Secretary DeVos)

352.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

353.    This count is brought on behalf of the IDR Plaintiffs and members of the IDR Class against the Department of Education.

354.    The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

355.    The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

a.    Failing to communicate the availability of IDR Plans to IDR Plaintiffs and members of the IDR Class, as required by Principle 15 of the Federal Internal Control Standards, by steering them into general forbearance and capitalizing accrued interest;

b.      Improperly placing IDR Plaintiffs' and members of the IDR Class's loans into general forbearance, instead of a B-9 administrative forbearance, to accommodate a failure to timely and promptly process IDR Plan Request Forms seeking a change of repayment plans, in violation of 34 C.F.R. § 685.205(b)(9);

c.      Capitalizing accrued interest on the loans of IDR Plaintiffs and members of the IDR Class during periods of a B-9 administrative forbearance, in violation of 34 C.F.R. § 685.205(b)(9);

d.      Denying IDR Plaintiffs' and members of the IDR Class IDR Plan Request Forms for deficiencies without allowing time to correct the deficiencies, as required by internal policies and procedures;

e.      Failing to apply the Missed Deadline Exception to qualified IDR Plaintiffs and members of the IDR Class, as required by 34 C.F.R. § 685.209(a)(2)(vii) and (ix) (PAYE), §685.209(b)(vi)(D) and (F) (ICR), §685.209(c)(4)(vii) (REPAYE), and 34 C.F.R. § 685.221(e)(7) and (9) (IBR);

f.      Failing to effect mandatory notice of the requirements of the IDR Plan and the annual deadline for submitting the IDR Plan Request Form and recertification documents, as required by 34 C.F.R. § 685.209(a)(5)(ii)-(v) (PAYE), § 685.209(b)(v) and (vi)(B); § 685.209(c)(4)(ii) and (iii) (REPAYE), and 34 C.F.R. § 685.221(e)(2)-(5) and by the provisions of the FFEL and Direct Loans Master Promissory Note.

g.      Capitalizing accrued interest on the loans of IDR Plaintiffs and members of the IDR Class who request to change from an IDR Plan to another repayment plan, without providing sufficient notice that leaving the IDR Plan to switch to another plan would cause the capitalization of interest, in violation of Principle 15 of the Federal Internal Control Standards;

h.      Failing to issue instructions and guidance to PHEAA and other loan servicers in the form of a Common Manual for the Direct Loan Program, as instructed by Congress in the Consolidated Appropriations Act of 2016 (P.L. 114-113);

i.      Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

j.      Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

k.      Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards.

l.      Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards;

356.    The Department's actions and the actions collectively, constitute a long-standing pattern of failing to administer the FFEL and Direct Loan Programs and IDR Plans in a manner that furthers the important policy and goals of the HEA and TEACH Grant Program – to serve the best interests of students.

357.    The Department's failure to administer the FFEL and Direct Loan Programs and IDR Plans over time in a manner that furthers the important policy and goals of the HEA and the FFEL and Direct Loan Programs further constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

358.    The Department's actions constitute final agency action.

359.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

360.     Accordingly, the Department's actions should be set aside. Plaintiffs request an order requiring the Department to provide IDR Plaintiffs and members of the IDR Class with a credit or refund for (i) the amount of interest improperly capitalized or capitalized as a result of the Department's actions, (ii) an amount that represents the lost federal interest subsidy benefits as a result of periods of improper forbearance or periods of forbearance that resulted from the Department's actions; and (iii) credit for qualifying payments towards forgiveness under the IDR Plan and/or PSLF Program missed as a result of periods of improper forbearance or forbearance that resulted from the Department's actions.

**COUNT III – ADMINISTRATIVE PROCEDURES ACT, 5 U.S.C. § 706(2)(A),**
**Agency Action that is Arbitrary and Capricious, an Abuse of**
**Discretion or Not in Accordance with Law (PSLF Program)**

**(Against the Department and Secretary DeVos)**

361.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

362.     This count is brought on behalf of the PSLF Plaintiffs and members of the PSLF Class against the Department of Education.

363.     The Administrative Procedures Act ("APA") provides that "the reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

364.     The Department acted arbitrarily and capriciously, abused its discretion, and/or failed to comply with the requirements of applicable statutes and regulations with respect to each of the following actions:

a.      Denying loan forgiveness for borrowers who met the requirements of the PSLF Program, in violation of 20 U.S.C.A. § 1087e(m);

b.      Denying loan forgiveness for borrowers who met the requirements of the TEPSLF Program;

c.      Denying PSLF Plaintiffs and members of the PSLF Class credit for all qualifying payments made towards PSLF forgiveness;

d.      Failing to effectively communicate the requirements of the PSLF Program to PSLF Plaintiffs and members of the PSLF Class, as required by Principle 15 of the Federal Internal Control Standards;

e.      Failing to notify PSLF Plaintiffs' and member of the PSLF Class who submitted PSLF Employment Certification forms or otherwise expressed interest in enrolling in the PSLF Program that they were not on a PSLF qualifying repayment plan, in violation of Principle 15 of the Federal Internal Control Standards;

f.      Failing to maintain the National Student Loan Data System in a way that (i) allows for the electronic exchange of data, including payments that qualify for PSLF forgiveness, between loan servicers, and (ii) maintains confidence in the data system, as required by 20 U.S.C.A. § 1092b;

g.      Failing to maintain records with accuracy, relevance, timeliness, and completeness reasonably necessary to assure fairness to decision making as required by the Freedom of Information Act, 5 U.S.C. §552(e)(5);

h.      Failing to issue instructions and guidance to PHEAA and other loan servicers in the form of a Common Manual for the Direct Loan Program, as instructed by Congress in the Consolidated Appropriations Act of 2016 (P.L. 114-113);

i.      Failing to sufficiently communicate instructions and guidance to PHEAA and other loan servicers, as required by Principle 15 of the Federal Internal Control Standards;

j.      Failing to monitor PHEAA and other loan servicers for servicer misconduct, as required by Principle 16 of the Federal Internal Control Standards;

k.      Failing to correct deficiencies identified in internal and external audits and investigations, as required by Principle 17 of the Federal Internal Control Standards; and

l.      Failing to enforce accountability for PHEAA and other loan servicers' failure to comply with all applicable laws, regulations, and FSA requirements, as required by Principle 5 of the Federal Internal Control Standards.

365.    The Department's actions collectively, constitute a long-standing pattern of failing to administer the PSLF Program in a manner that furthers the important policy and goals of the HEA and PSLF Program further constitutes actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

366.    The Department's actions constitute final agency action.

367.    No further exhaustion is necessary, and in any event, attempts at further exhaustion would be futile.

368.    Accordingly, the Department's actions should be set aside. PSLF Plaintiffs request an order requiring the Department to (i) conduct a full accounting review of the qualifying payments made by PSLF Plaintiffs and members of the PSLF Class and provide explanation for any payment that is deemed a non-qualifying payment; (ii) provide additional credit for all payments made after Plaintiffs and members of the PSLF Class submitted PSLF Employment Certification Requests or otherwise expressed a documented interest in the PSLF Program, regardless of repayment plan; (iii) grant loan forgiveness for any PSLF Plaintiff or

member of the PSLF Class who have made 120 qualifying payments and such additional

payments; (iv) provide a credit or refund for any payment of principal and interest made after the

date of the last qualifying or additional payment.

## COUNT IV - FIFTH AMENDMENT DUE PROCESS

### (Against the Department and Secretary DeVos)

369.    Plaintiffs incorporate by reference the allegations contained in the proceeding

paragraphs as if fully set forth herein.

370.    This Count is brought on behalf of the TEACH Plaintiffs and members of

nationwide TEACH Class against the Department.

371.    The Fifth Amendment of the U.S. Constitution provides: "No person shall…be

deprived of life, liberty, or property, without due process of law." Due process requires that, at a

minimum, individuals receive notice and an opportunity to be heard before they are deprived of

property.

372.    The TEACH Plaintiffs and members of the TEACH Class who have completed

four years of the required teaching service have a constitutionally protected property interest in a

government benefit to which they are legitimately entitled, namely their statutory interest in the

TEACH Grant.

373.    The TEACH Plaintiffs and members of the TEACH Class were deprived of their

property interest when the Department improperly converted their TEACH Grants to interest

bearing TEACH Loans due to the Department's own misconduct. The Department denied the

TEACH Plaintiffs and members of the TEACH Class their right to the TEACH Grants without

adequate process.

374.    The Department failed to institute an adequate process to identify and account for errors the Department and loan servicers made in converting the TEACH Plaintiffs and members of the TEACH Class grants into interest bearing TEACH Loans.

375.    The Due Process Clause Requires the Department to implement a process that gives borrowers adequate notice of conversions, etc. and a meaningful process to identify and account for issues related to this statutory entitlement including payment counting issues.

## COUNT V - FIFTH AMENDMENT DUE PROCESS

### (Against the Department and Secretary DeVos)

376.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

377.    This Count is brought on behalf of the PSLF Plaintiffs and members of nationwide PSLF Class against the Department.

378.    The Fifth Amendment of the U.S. Constitution provides: "No person shall…be deprived of life, liberty, or property, without due process of law." Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

379.    The PSLF Plaintiffs and members of the PSLF Class who have made 120 qualifying payments while working full time for a qualifying employer have a constitutionally protected property interest in a government benefit to which they are legitimately entitled, namely loan forgiveness under the PSLF Program.

380.    The PSLF Plaintiffs and members of the PSLF Class were deprived of their property interest when the Department denied their PSLF applications. The Department denied

the PSLF Plaintiffs and members of the PSLF Class their right to loan forgiveness under the PSLF Program.

381.     The Department failed to institute an adequate process to identify and account for errors the Department and loan servicers made in denying PSLF applications.

382.     The Due Process Clause Requires the Department to implement a process that gives borrowers adequate notice of conversions, etc. and a meaningful process to identify and account for issues related to this statutory entitlement.

## COUNT VI - BREACH OF CONTRACT (TEACH AGREEMENT TO SERVE)

### (Against the Department and Secretary DeVos)

383.     Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

384.     This count is brought on behalf of the TEACH Plaintiffs and members of a nationwide TEACH Class.

385.     At all relevant times, TEACH Plaintiffs and members of the TEACH Class had a valid and enforceable contract with the Department in the form of the TEACH Agreement to Serve.

386.     TEACH Plaintiffs and members of the TEACH Class have performed or substantially performed all material terms of their obligations under the contract.

387.     Despite TEACH Plaintiffs and members of the TEACH Class substantial compliance with the Agreement to Serve, the Department breached its contractual obligations by improperly converting the grants to interest-bearing loans.

388.    As a proximate consequence of the Department's breach, the TEACH Plaintiffs and members of the TEACH Class suffered injury due to the improper conversion of the TEACH Grant to a TEACH Loan.

## COUNT VII - BREACH OF CONTRACT (MASTER PROMISSORY NOTE)

### (Against the Department and Secretary DeVos)

389.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

390.    This count is brought on behalf of the IDR Plaintiffs and members of Nationwide IDR Class.

391.    At all relevant times, IDR Plaintiffs and members of the IDR Class had a valid and enforceable contract with the Department in the form of an FFEL or Direct Loan Master Promissory Note ("MPNs').

392.    IDR Plaintiffs and members of the IDR Class have performed or substantially performed all material terms of their obligations under the MPNs.

393.    The MPNs between the Department and IDR Plaintiffs and members of the IDR Class require the Department to comply with all applicable federal law.

394.    The MPNs further require that any required notice to be given "will be effective if it is sent by first-class mail to the most recent address that [the Department has] for [Plaintiff], by electronic means to an email address [Plaintiff has] provided, or by any other method of notification that is permitted or required by applicable law and regulations."

395.    Despite IDR Plaintiffs and members of the IDR Class substantial compliance with the MPNs, the Department failed to follow applicable federal statutes and regulations as alleged herein. It further failed to effect notice of the required notices under 34 C.F.R. § 685.209(a)(5)(ii)-(v) (PAYE), § 685.209(b)(v) and (vi)(B); § 685.209(c)(4)(ii) and (iii)

(REPAYE), and 34 C.F.R. § 685.221(e)(2)-(5) by sending the required notices only to an online "paperless inbox."

396.    As a proximate consequence of the Department's breach, IDR Plaintiffs and members of the IDR Class have suffered various injuries including (a) exhaustion of their eligibility for forbearance in the future, when they may actually need it, (b) denial of the benefits of an IDR Plan, (c) denial of the opportunity to make qualifying payments toward forgiveness under the PSLF Program and IDR Plans, (d) denial of federal interest subsidies that the Department must contribute on their behalf during repayment; (e) capitalization of accrued interest, which increases the principal loan balance and monthly payment amount, (f) loss of credit for qualifying payments towards forgiveness under the PSLF Program, and (g) denial of forgiveness under the PSLF Program.

## COUNT VIII – BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)

### (Against PHEAA)

397.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

398.    The Department and PHEAA entered into a contract on or about June 17, 2009 (Contract No. ED-FSA-09-D-0014), pursuant to which PHEAA agreed to provide servicing for certain Federal Student Loans, including the student loans of Plaintiffs and members of all Class, and have since amended and expanded the scope of work of such contract on numerous occasions (hereinafter, collectively, the "Servicing Contract").

399.    The specific work to be performed by PHEAA pursuant to the Servicing Contract includes, *inter alia*, the servicing of the Public Service Loan Forgiveness program,

implementation of the various Income Driven Repayment options (including ultimate loan forgiveness under such options), and the TEACH Grant program.

400.   PHEAA's obligation under the Servicing Contract is to "be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur."

401.   The Servicing Contract further requires PHEAA to "provide commercially available services that will yield . . . high levels of customer satisfaction[,]" and to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt."

402.   The Servicing Contract sets forth detailed requirements for PHEAA's performance of its loan servicing work, including, but not limited to, the following:

- "The servicer shall post payments to the borrower accounts on the same date of receipt of payment information from the treasury."

- "The servicer shall maintain proper controls over payment posting and accounting activities, and perform daily and monthly required reconciliations."

- "The servicer shall promptly manage credit balance accounts, and other payments and accounts requiring a refund.  The servicer shall process refund transactions to borrowers (borrower overpayments) . . . ."

- "The servicer shall establish a system and processes to correctly record all transactions on their database."

- "The servicer's procedures and systems shall include a system of internal controls that ensures resource use is consistent with laws, regulations and policies."

- "The servicer shall process discharge transactions with required supporting documentation following the required regulatory guidelines. The servicer is required to facilitate the timely and accurate processing of

discharge requests by ensuring that complete loan discharge documentation for the individual is submitted."

- "The servicer shall respond to written and email questions and requests timely and accurately."

- "The servicer shall respond and resolve customer complaints; and create and execute a plan to escalate complaints to FSA and the Ombudsman."

403.     The Servicing Contract expressly imposes various responsibilities on PHEAA to the borrowers.  For example, with regard to PHEAA's servicing of the PSLF program, the Servicing Contract states: "The purpose of this effort is to implement a PSLF servicer to enable borrowers to track qualifying payments and employment, using the Employment Certification Form, while in the process of qualifying for PSLF."

404.     Further, the Servicing Contract requires PHEA to be able to:

- "Collect, review and retain the submitted employment certifications;

- Receive all eligible loans and provide comprehensive servicing of all federally held loans to borrowers who may or may not ultimately be eligible for forgiveness based on public service;

- Determine that the borrower has made qualifying payments while employed in qualifying public service;

- Track PSLF eligibility status for the on-track borrower;

- Report tracking information to NSLDS."

405.     With regard to IDR plans, the Servicing Contract sets forth numerous detailed performance requirements for PHEAA for the benefit of the borrower, including, *inter alia*, that PHEAA "shall process the loan forgiveness after the borrower has satisfied 25 years of repayment on income-based repayment."

406.    With regard to TEACH Grants, PHEAA's promise in the Servicing Contract is to "to accept, process, and service TEACH Grants, in accordance with Attachment 8 - TEACH Grant Requirements."

407.    The TEACH Grant Requirements in the Servicing Contract again obligate PHEAA to undertake specific responsibilities to borrowers, including, but not limited to:

- "Servicer will manage the TEACH Grant Certification Process for a recipient that has not started teaching."

- "Servicer will service TEACH Grant while Recipients are Completing their service obligation once employed as a teacher."

- "Servicer will evaluate a TEACH Grant Recipient's ability to satisfy his/her TEACH Grant service obligations."

408.    Plaintiffs and members of all Classes are the intended third-party beneficiaries of the Servicing Contract.

409.    The Servicing Contract reflects the express and/or implied intention by PHEAA and the Department to benefit the borrowers, i.e., the Plaintiffs and members of all Classes. Specifically, by delineating the precise responsibilities undertaken by PHEAA to the borrowers, PHEAA and the Department demonstrate a clear intent to rebut any presumption that Plaintiff and members of all Classes are merely incidental beneficiaries of the Servicing Contract, and further demonstrate that Plaintiff and members of all Classes are the intended beneficiaries of the Servicing Contract.

410.    The text and purpose of the Servicing Contract, and an examination of the Servicing Contract as a whole, evinces the intent of PHEAA and the Department to benefit the Plaintiffs and members of all Classes.

411.    Further evincing the intent to benefit the borrowers are the circumstances of the transaction between PHEAA and the Department, which, because the Servicing Contract is mandated by a federal statute, includes the governing statute and its purpose.  To this end, 20 U.S.C.A. § 1087f provides "the Secretary [of Education] shall enter into contracts only with entities that have extensive and relevant experience and demonstrated effectiveness."

412.    The Department specifically contracted with PHEAA for the purpose of servicing the federal student loans of Plaintiffs and members of all Classes.  Indeed, the MPN, the contract between borrowers and the Department, indicates that a contractor, like PHEAA, may service the loans and directs borrowers to such servicers for loan-related issues.  After the loan repayment period has begun, the Department directs borrowers to contact their loan servicers for information about repayment issues. For example, since at least 2015, if not earlier, the Department has issued the following instruction to borrowers after submitting an IDR Request Form: "If you have questions regarding the next steps in the processing of your application, or wish to cancel the application, contact your servicer(s)."

413.    In addition to the specific obligations imposed on PHEAA for the benefit of the borrowers, the Servicing Contract required compliance with all applicable federal law.

414.    As set forth in detail herein, PHEAA breached the Servicing Contract by failing to properly service borrowers' federal student loans, including Plaintiffs and members of all Classes, as required by the terms of the Servicing Contract and applicable federal law.

415.    Alternatively, even if it is determined that PHEAA did not breach its express obligations under the Servicing Contract, PHEAA breached the covenant of good faith and fair dealing implied in the Servicing Contract.

416.    PHEAA's breach of the Servicing Agreement directly harmed Plaintiffs and members of all Classes, as detailed herein.

417.    As a result of PHEAA's breach of the Servicing Contract, of which Plaintiffs and members of all Classes were intended third party beneficiaries, Plaintiffs and members of all Classes are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court, as set forth below.

## COUNT IX – BREACH OF FIDUCIARY DUTY

### (Against PHEAA)

418.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

419.    This count is brought on behalf of all Plaintiffs and members of all Classes.

420.    The Department, as the owner and guarantor of Plaintiffs' federal student loans, has a confidential and/or fiduciary relationship with Plaintiff and the Class members.

421.    PHEAA, by virtue of its loan servicing contract, the policies and goals of the HEA and Title IV Programs, has a confidential and/or fiduciary relationship with Plaintiffs and class members.

422.    PHEAA further holds itself out as a fiduciary

423.    In accordance with the 2009 Contract, the Department represents to Plaintiffs, the class members, the public, and Congress that it acts in the best interest of borrowers, including providing them advice, information, and other tools to assist them in choose the "right" or "best" repayment plan based on their circumstances.

424.    As such, the Department and PHEAA act in a position of advisor or counselor and represents that it will act in good faith and in the interests of Plaintiffs and class members.

425.    Furthermore, the relative positions of the Department, PHEAA, and borrowers, including Plaintiffs and class members, is such that the Department and PHEAA have the power and means to take advantage of, or exercise undue influence over, borrowers, including Plaintiffs and class members.

426.    The Department and PHEAA exploited its relationship with Plaintiffs and class members by making representations and engaging in misconduct that violated this confidential or fiduciary relationship. As such, the Department and PHEAA are operating in a manner most beneficial to themselves rather than the borrowers, including Plaintiffs and class members.

427.    The Department and PHEAA's breach of its confidential or fiduciary relationship was the direct and proximate cause of the injuries suffered by Plaintiff and the Class members, as detailed herein.

## COUNT X - CONSTRUCTIVE FRAUD

### (Against PHEAA)

428.    Plaintiffs incorporate by reference all preceding allegations.

429.    This count is brought on behalf of all Plaintiffs and members of a nationwide Classes against PHEAA.

430.    PHEAA holds itself out as having a confidential and/or fiduciary relationship with Plaintiffs and the Classes.

431.    PHEAA represents to Plaintiffs and Class members that it is acting in their best interests.

432.    As such, Defendant acts in a position of advisor or counselor as reasonably to inspire confidence in student loan borrowers that they will act in good faith for the student loan borrower's interest.

433.    Further, the relative position of PHEAA and student loan borrowers, including Plaintiffs and members of the Classes, is such that PHEAA has the power and means to take advantage of or exercise undue influence over the student loan borrowers, and in fact has exercised power and undue influence over student loan borrowers.

434.    Some of Defendant's fraudulent conduct, misrepresentations and/or omissions include, but are not limited to:

b) causing and/or creating issues with student loan borrowers' repayment, resulting in student loan borrowers having to be placed on forbearance or deferment;

c) enrolling student loan borrower's in a different repayment plan than he or she is currently in, against his or her will and without permission,

d) refusing to return improperly switched borrowers to their previous plan without any cost or delay to the student loan borrower,

e) intentionally causing student loan borrower's information processing to last more than one month;

f) intentionally delaying student loan borrower's payments on income-driven repayment plans

g) charging extra fees the student loan borrower would not have to pay if the student loan borrower did not switch payment plans,

h) charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower was not switched payment plans,

i) charging extra capitalized interest Defendant would not be entitled to if the student loan borrower was not switched to a different payment plan,

j) collecting monthly servicing fees/payments as student loan borrowers would have more months prior to his or her loan being forgiven or paid off.

435.    As such, PHEAA is operating in a way most beneficial to itself and, often, in a manner directly opposite of that requested by the student loan borrower, such as Plaintiffs and

members of the Classes, despite holding themselves out as acting in the best interest of the student loan borrower.

436.    PHEAA's fraudulent actions and fraudulent misrepresentations were directed toward Plaintiffs and members of the Classes.

437.    PHEAA intended for student loan borrowers, including Plaintiffs, to rely on its actions and fraudulent misrepresentations in determining which IDR Plan was best for the student loan borrowers, in being placed in the correct and best IDR Plan for the student loan borrowers, and in having their IDR Plan Request Forms processed and carried out in an effective and efficient manner.

438.    Defendant also intended for student loan borrowers, including Plaintiffs and members of the Classes, to rely on their documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

439.    As such, PHEAA intended for student loan borrowers to rely on its actions and fraudulent misrepresentations and, therefore, create, or cause a likelihood of, confusion or of misunderstanding about the best IDR Plan for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their IDR Plans were to be processed and carried out.

440.    PHEAA's actions and misrepresentations occurred during the presentation of information involving its loan servicing activities.

441.    Plaintiffs and members of the Classes relied on PHEAA's confidential or fiduciary relationship and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by PHEAA about IDR Plans, (2) being coerced or forced into forbearance

due to PHEAA's actions, (3) being unable to return to their previously chosen IDR Plan without ramifications, and (4) PHEAA's document and information processing procedures that last more than one month.

442.    Plaintiffs and members of the Classes damages were directly and proximately caused by Defendant's breach of a confidential or fiduciary relationship.

443.    As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful, intentional, and outrageous conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive.

444.    258. Defendant's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT XI - UNJUST ENRICHMENT

### (Against PHEAA)

445.    Plaintiffs incorporate by reference all preceding allegations.

446.    This count is brought against PHEAA on behalf of members of the Nationwide Class.

447.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

448.    PHEAA has unlawfully benefited from the misconduct alleged in this Complaint.

449.    PHEAA unlawfully received millions of dollars in loan servicing fees by collecting for the Department millions of dollars in overpayments of additional principal and interest that were not otherwise owed but for PHEAA's unlawful actions.

450.    PHEAA's financial benefits resulting from the unlawful and inequitable acts are traceable to the overpayments made by Plaintiffs and the Classes.

451.    Plaintiffs and the Classes have conferred upon PHEAA an economic benefit in the nature of loan servicing profits that resulted from the unlawful collection of overpayments, to the economic detriment of Plaintiffs and the Classes.

452.    The economic benefit of loan servicing fees derived by PHEAA through collecting overpayments of principal and interest is a direct and proximate result of PHEAA's unlawful conduct.

453.    The economic benefits derived by PHEAA rightfully belong to Plaintiffs and the Classes, as they made overpayments of principal and interest, benefiting PHEAA.

454.    It would be inequitable under unjust enrichment principles under the law of Pennsylvania to be permitted to retain any of the loan servicing fees derived from Plaintiffs' and the Classes overpayments of principal and interest as a result of PHEAA's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

455.    PHEAA is aware of and appreciate the benefits bestowed upon it by Plaintiffs and the Classes.

456.    PHEAA should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Classes all unlawful or inequitable proceeds they received.

457.    A constructive trust should be imposed upon all unlawful or inequitable sums received by PHEAA traceable to Plaintiffs' and the Classes.

## COUNT XII – NEGLIGENCE

### (Against PHEAA)

458.    Plaintiffs incorporate the allegations contained in the previous paragraphs by reference.

459.    PHEAA owed—and continues to owe—duties to Plaintiffs and the Class to use reasonable care in:

   a.  Providing accurate information to borrowers regarding the terms and status of their loans;

   b.  Providing accurate and timely information to borrowers regarding their options and obligations with respect to repayment, grant certification, forgiveness, discharge, cancellation, default, and forbearance;

   c.  Assisting borrowers with choosing an appropriate repayment plan, program, or strategy;

   d.  Processing documents, inquiries, certifications, and applications from borrowers in a timely fashion to ensure borrowers remain eligible for the programs they qualify for;

   e.  Collecting payments from borrowers and applying payments to loan balances; and

   f.  Updating borrowers' files and loan status information based on the information and payments received.

460.    These duties arise from several sources, including, but not limited to, the sources described below, and are independent of any duty PHEAA owed as a result of contracts between it and Plaintiffs and the class members.

461.    PHEAA has a common law duty to prevent the foreseeable risk of harm to others, including Plaintiffs and the Class. Plaintiffs have student loans held by the Department of Education. With respect to the loans at issue in this case, borrowers such as Plaintiffs and Class Members have no ability to choose their loan servicer. The Department's choice to award PHEAA the servicing contract for these loans made PHEAA the exclusive entity borrowers could interact with to obtain information about their specific loans or conduct any repayment-related actions. As a result of PHEAA's position as the exclusive servicer for these loans, it was foreseeable to PHEAA that Plaintiffs and the Class could suffer financial harm if PHEAA failed to exercise reasonable care while performing its servicing functions.

462.    It was foreseeable to PHEAA that borrowers would be injured if PHEAA failed to properly administer the TEACH Grants Program by improperly converting TEACH Grants to loans, failing to timely notify borrowers of their recertification requirements, or failing to process recertification information submitted by borrowers. PHEAA knew that the conversion of TEACH Grants into direct loans would cause the grant recipients to incur a significant increase in their debt and interest repayment obligations.

463.    It was also foreseeable to PHEAA that injury would result from a failure to use reasonable care in servicing the IDR and PSLF programs. As explained above, participation in these programs depends on whether borrowers qualify, whether they submit timely recertification documents, and whether the correct number of qualifying payments are made. To this end, it was foreseeable that if PHEAA did not administer and service these programs with reasonable care, PHEAA's servicing failures would exhaust borrowers' future forbearance eligibility, block the Department of Education from paying Federal Interest Subsidies borrowers are entitled, deny borrowers the opportunity to participate in alternative payment plans, erase

reduced interest rates available to borrowers in repayment, delay borrowers' opportunity to seek loan forgiveness, add to borrowers' principal loan balance, and increase their monthly loan payments.

464.    It was also foreseeable to PHEAA that if it failed to use reasonable care in advising borrowers when and whether forbearance was an appropriate choice for them, and providing borrowers with pertinent information about the consequences of forbearance, then borrowers could be financially injured if their loans were put into forbearance at an inappropriate time and accrued interest was capitalized.

465.    In addition to its general duty to exercise reasonable care, PHEAA also had a duty of care as a result of the special relationship that existed between PHEAA on one hand and Plaintiffs and the class members on the other. The special relationship arose because the Department of Education entrusted PHEAA to utilize "efficient and effective commercial contract services to manage all types of Title IV student aid obligations, including, but not limited to, servicing and consolidation of outstanding debt." Only PHEAA was in a position to ensure that its servicing systems were sufficient to protect against the harm to Plaintiffs and the class members from PHEAA's insufficient servicing measures.

466.    PHEAA assumed a duty to use reasonable care in servicing loans for the millions of borrowers in its portfolio. Even beyond PHEAA's assumption of these duties through its contract with the Department, PHEAA's statements to borrowers indicate that PHEAA intended for borrowers to rely on PHEAA as a primary source for information and assistance when deciding what actions to take with respect to their student loans. For instance, PHEAA refers to its call center representatives as "Loan Counselors," and its websites are replete with representations and instructions PHEAA clearly intended borrowers to rely on when making

decisions about repaying their loans. For virtually every potential repayment or forgiveness option, PHEAA's website directs borrowers to contact PHEAA in order to initiate, continue, or discuss the option with one of PHEAA's representatives. PHEAA knew that if it failed to provide accurate information or use reasonable care in servicing loans, borrowers could be confused, misled, or incorrectly processed, leading to significant financial consequences for the borrowers.

467.    PHEAA was also under statutory and regulatory duties to use reasonable care in servicing loans.  For instance, under 34 C.F.R. § 682.211 and as a result of PHEAA's contracts with the Department, PHEAA owed a duty to borrowers like Plaintiffs and the Class to provide them with information that would aid them in understanding the impact of capitalization of interest on the loan principal, including information regarding the total interest to be paid over the life of the loan if the loan was placed into forbearance.

468.    Under the Consumer Financial Protection Act of 2010, PHEAA was under a duty to refrain from engaging in in any "unfair, deceptive or abusive act or practice" when servicing student loans. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

469.    Finally, PHEAA's duty to use reasonable care in servicing student loans arose not only as a result of the common law and the statutes described herein, but also because it was bound by, and had committed to comply with, industry standards, as represented by the Department of Education to borrowers, as well as in the Department's contract for services with PHEAA.

470.    PHEAA breached its duties and thus was negligent by failing to use reasonable care in servicing Plaintiffs' and the class members' loans correctly and on time. Upon

information and belief, the specific negligent acts and omissions committed by PHEAA include, but are not limited to, some, or all, of the following:

g.  Failing to provide accurate information to borrowers regarding the terms and status of their loans, including the requirements and deadlines for maintaining status in various repayment and forgiveness programs;

h.  Failing to timely notify borrowers of upcoming deadlines to comply with TEACH Grant requirements, failing to properly record and process recertifications submitted by TEACH Grant recipients, and improperly converting TEACH Grants into loan and interest balances;

i.  Placing borrowers' accounts into forbearance to accommodate its own servicing failures, or as a result of breaching its duty to assist borrowers, and failing to timely and fully inform borrowers of the financial consequences and interest capitalization that will result from forbearance;

j.  Denying borrowers the opportunity to make Qualifying Payments for PSLF and IDR forgiveness when it fails to timely and properly process IDR Request Forms, or fails to notify borrowers of recertification requirements, thereby extending the life of borrowers' loans;

k.  Failing to properly count borrowers' PSLF and IDR Qualifying Payments;

l.  Exhausting borrowers' eligibility to request forbearance in the future, when they may actually need it;

m.  Denying borrowers Federal Interest Subsidies the Department of Education must make on their behalf;

n.  Triggering the capitalization of borrowers' interest, thereby increasing borrowers' outstanding principal and monthly payment amounts;

o.  Failing to educate borrowers about the consequences of switching repayment plans, including but not limited to borrowers having to choose between forbearance and the fixed, 10-year Standard Repayment Plan upon a change; and

p.  Collecting amounts not legitimately due and owing and failing to refund them to borrowers.

471.    In connection with the conduct described above, PHEAA acted wantonly, recklessly, and with complete disregard for the consequences.

472.    As a direct and proximate result of PHEAA's negligent conduct, Plaintiff and the Class have suffered substantial losses as detailed herein.

## COUNT XIII - NEGLIGENT MISREPRESENTATION
### (Against PHEAA)

60. Plaintiffs incorporate the allegations contained in the previous paragraphs by reference.

61.    Because its primary function is loan servicing, PHEAA is in the business of routinely supplying information that is intended to be relied upon by borrowers and is in fact relied upon by borrowers. PHEAA earns income by fulfilling its loan servicing obligations under its contract with the Department. Since PHEAA knew that borrowers needed to rely on PHEAA, and as a result of PHEAA's pecuniary interest in servicing borrowers' loans, PHEAA was under a duty to provide timely, accurate information to borrowers.

62.    By virtue of the Department's selection of PHEAA as the *exclusive* servicer of the subject loans, and the obligations imposed by the HEA and implementing regulations, PHEAA was under a public duty to provide accurate information to the borrowers about the terms and

status of their loans, their options for repayment, and the consequences of various courses of action.

63.    Borrowers like Plaintiffs and the Class reasonably relied on information provided by PHEAA, and reasonably relied upon PHEAA to provide accurate information at timely intervals. In fact, Plaintiffs and the Class had no other choice but to rely on communications from PHEAA while managing their student loan repayment options.

64.    PHEAA breached its duties to provide timely and accurate information to borrowers in various ways.  In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."

65.    At no time did PHEAA notify Plaintiffs and Class Members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR plans, including REPAYE, within the necessary 15-day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or

did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under ALRPs at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost qualifying PSLF payments and TEACH grants being incorrectly converted into loans, respectively.

## COUNT XIV - VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Stat. Ann. § 201-1 *et seq.*)

### (Against PHEAA)

60.    To the extent they are not inconsistent herewith, Plaintiffs incorporate each preceding paragraph as if fully restated herein.

61.    All Plaintiffs (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves, the Nationwide Class, and the Pennsylvania Class against PHEAA. Plaintiffs' injuries and those of the Nationwide Class and Pennsylvania Class arise from PHEAA's violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (for the purposes of this section, "UTPCPL") as a commercial student loan servicer.

62.    Plaintiffs, Nationwide Class members, Pennsylvania Class members, and PHEAA are "persons" within the meaning of 73 P.S. § 201-2(2).

63.    PHEAA is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

64.    The Pennsylvania UTPCPL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 P.S. § 201-3.

65.     In the course of its business, PHEAA concealed and suppressed material facts concerning the commercial student loan services it provided Plaintiffs and Pennsylvania Class Members. PHEAA accomplished this by representing, for example and without limitation, that it "best serves [borrowers'] needs" when borrowers are "transparent about [their] concerns and [their] situation." PHEAA also represented, for example, that its "ability to address [borrowers'] concerns will be based on – and in some cases limited by – " three factors: (1) "applicable federal and state laws and regulations," (2) "the terms of [borrowers'] loan agreement or promissory note," and (3) "lender policies and guidelines."[106]

66.     At no time did PHEAA notify Plaintiffs and Pennsylvania Class members that its ability to "best serve" their needs would also be undermined by its own insufficient, unfair, and/or fraudulent practices and procedures, including for example and without limitation, PHEAA: (a) failing to enroll qualifying borrowers that submitted applications for the PSLF, TEACH, and IDR programs; (b) failing to process borrower applications for IDR plans, including REPAYE, within the necessary 15-day period; (c) failing to inform borrowers that PHEAA would only communicate through a "paperless inbox" and then deleting messages and/or account borrower account history; (d) placing borrowers into deferment or forbearance who did not apply for or did not meet the criteria for that reason; (e) steering borrowers into forbearance when IDR programs were available; (f) failing to fully explain and/or provide borrowers with information to understand the consequences of entering forbearance, including the impact of capitalization of interest; (g) failing to properly calculate borrowers' monthly payments under IDRs at a level consistent with their income and family size; and (h) failing to process borrowers' recertification forms under the PSLF and TEACH programs, resulting in lost

---

[106] PHEAA: Office of Consumer Advocacy, *available at* https://www.pheaa.org/about/contact-us/office-consumer-advocacy.shtml (last accessed Oct. 23, 2019).

qualifying PSLF payments and TEACH grants being incorrectly converted into loans, respectively.

67.     PHEAA thus violated the Pennsylvania DTPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that Plaintiffs and Pennsylvania Class members rely upon such concealment, suppression or omission, in connection with the servicing of their federal student loans. Plaintiffs did in fact rely on such deceptive acts or practices described herein.

68.     By failing to carry out its federal loan programs as advertised, PHEAA also intentionally created a likelihood of confusion and misunderstanding that affected the public generally, and Plaintiffs and the Pennsylvania Class members specifically, in violation of Pennsylvania DTPA.

69.     PHEAA knew the true nature of its student loan servicing but concealed that information. As described herein, recent state and federal investigations have only recently brought PHEAA's deceptive acts and practices to light.

70.     Based on the forgoing, PHEAA also violated the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), see 73 Pa. Stat. Ann. § 2270.5(a), by engaging in false, deceptive, and misleading representations and means, and unfair and unconscionable means in connection with the collection of alleged debts. See 73 Pa. Stat. Ann. § 2270.4(b)(5) and (6).

71.     PHEAA is a "creditor" and Plaintiff is a "consumer" under the FCEUA. See 73 Pa. Stat. Ann. § 2270.3. Plaintiff has suffered ascertainable loss as a result of PHEAA's violations of the FCEUA, which constitutes a violation of the UTPCPL

72.     Plaintiffs and Pennsylvania Class members suffered ascertainable losses and actual damages as a direct and proximate results of PHEAA's misrepresentations and its concealment of and failure to disclose material information, including for example, increased payments, payment of deferment or forbearance fees, increased interest, and extended time until Plaintiffs and Pennsylvania Class members qualified for loan forgiveness, causing Plaintiffs and the Pennsylvania Class to incur additional payment obligations before the end of their loan terms.

73.     Additionally, Plaintiffs and many Pennsylvania Class members often times had no meaningful choice and were required to submit to PHEAA's practices because PHEAA was their assigned loan servicer and the exclusive provider of the PLSF and TEACH programs. Thus, Plaintiffs and Pennsylvania Class members were required to continuing having PHEAA service their loans even when it engaged in fraudulent or deceptive misconduct.

74.     PHEAA's violations present a continuing risk to Plaintiffs, Pennsylvania Class Members, and the general public at large. To this end, PHEAA's unlawful acts and practices complained of herein affect the public interest.

75.     Plaintiffs and Pennsylvania Class members seek all monetary and non-monetary relief allowed by law; punitive damages; injunctive relief; reasonable attorneys' fees and costs; and any other just and appropriate relief under the Pennsylvania DTPA.

76.     Plaintiffs and the Pennsylvania Class seek to enjoin such unlawful, deceptive acts and practices as described above. Each member of the Pennsylvania Class will be irreparably harmed unless the unlawful actions of the PHEAA are enjoined, as PHEAA will continue to distribute false and misleading information regarding borrowers' loans, process borrowers' payments incorrectly, and delay applications for PLSF, TEACH grant, and IDR programs.

Absent injunctive relief, PHEAA will continue to administer loans in a manner that harms

consumers and directly conflicts PHEAA's representations as serving the best interests of

borrowers, as well as directly conflicts the intent of Congress and the Department's guidelines,

as detailed more fully herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes pray that the Court:

A.     Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure

23, and appoint Plaintiffs as Class Representatives and Laura K. Mummert of Lowey

Dannenberg, P.C. and Gary F. Lynch of Carlson Lynch, LLP as Co-Lead Class Counsel;

B.     Declare that the Department's actions are arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, in violation of the APA;

C.     Setting aside the Department's alleged actions;

D.     Granting preliminary and permanent injunctive relief;

E.     Issue an order declaring PHEAA's conduct as alleged herein is unlawful;

F.     Issue an order enjoining PHEAA from continuing the unlawful practices alleged

in this Complaint;

G.     Enter judgment for the damages sustained by Plaintiffs and members of the

Classes defined herein, and for any additional damages, penalties and other monetary relief

provided by applicable law, including treble damages, statutory damages and/or punitive

damages;

H.     Issue an order requiring PHEAA to institute a corrective review process to

remedy PHEAA's wrongful conduct;

I.    Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

J.    Award Plaintiffs and Class members their reasonable attorney's fees and costs; and

K.    Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all matters so triable.

Dated: West Conshohocken, PA
       November 8, 2019

**LOWEY DANNENBERG, P.C.**

Laura K. Mummert (PA ID 85964)
Anthony M. Christina (PA ID 322528)
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
lmummert@lowey.com
achristina@lowey.com

**CARLSON LYNCH, LLP**
Gary F. Lynch (PA ID 56887)
Kevin W. Tucker (PA ID 312144)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
glynch@carlsonlynch.com
ktucker@carlsonlynch.com

*Counsel for Plaintiffs and the Proposed Class*

JS 44 (Rev 02/19)

## CIVIL COVER SHEET

19-cv-5278

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM )*

19  5278

### I. (a) PLAINTIFFS
Katherine Wardlow et al

### DEFENDANTS
Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing and d/b/a American Education Services, & S. Dept of Education, Secretary Elisabeth DeVos (in her official capacity)

**(b)** County of Residence of First Listed Plaintiff   Monroe County, NY
*(EXCEPT IN U S PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dauphin, PA
*(IN U S PLAINTIFF CASES ONLY)*
NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** Attorneys *(Firm Name, Address and Telephone Number)*
Lowey Dannenberg, P C , Laura K Mummert, Esq
100 Front Street, West Conshohocken, PA 19428
(215) 399-4770

Attorneys *(If Known)*
Drew H Campbell, Bricker & Eckler LLP, (614) 227 2319 (PHEAA)
Terrance A Mebane, DOJ, (202) 307-0493 (Dept of Ed , Sec Devos)
John C. Grugan, Ballard Spahr, LLP, (215) 864 8226 (PHEAA)

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U S Government
      Plaintiff

☐ 3  Federal Question
      *(U S Government Not a Party)*

☒ 2  U S Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for  Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U S Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS  Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☒ 8 Multidistrict
     Litigation -
     Direct File

### VI. CAUSE OF ACTION
Cite the U S Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
Administrative Procedures Act, 5 U S C  § 706(2)(A)
Brief description of cause
Violation of the APA, state consumer protection law, common law regarding deceptive student loan practices

### VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P

**DEMAND $**
5,000,000

CHECK YES only if demanded in complaint
**JURY DEMAND:**   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE   Hon C Darnell Jones, II

DOCKET NUMBER   2:18-md-02833 (E D Pa )

DATE
11/08/2019

SIGNATURE OF ATTORNEY OF RECORD
*Laura Mummert*

NOV - 8 2019

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                APPLYING IFP                JUDGE                MAG JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**19   5278**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff. Katherine Wardlow - 83 Delray Road, Rochester, NY 14610

Address of Defendant. PHEAA - 1200 N 7th St, Harrisburg, PA 17102

Place of Accident, Incident or Transaction: 1200 N 7th St, Harrisburg, PA 17102

**RELATED CASE, IF ANY:**

Case Number 2:18-md-02833 (E.D. Pa.)  Judge Hon. C. Darnell Jones, II  Date Terminated

Civil cases are deemed related when *Yes* is answered to any of the following questions.

1  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above

DATE 11/08/2019    PA ID # 85964
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I D # (if applicable)*

**CIVIL: (Place a ✓ in one category only)**

**A.  *Federal Question Cases:***
1  Indemnity Contract, Marine Contract, and All Other Contracts
2  FELA
3  Jones Act-Personal Injury
4  Antitrust
5  Patent
6  Labor-Management Relations
7  Civil Rights
8  Habeas Corpus
9  Securities Act(s) Cases
10  Social Security Review Cases
☑ 11  All other Federal Question Cases
*(Please specify)* Administative Procedures Act

**B.  *Diversity Jurisdiction Cases:***
1  Insurance Contract and Other Contracts
2  Airplane Personal Injury
3  Assault, Defamation
4  Marine Personal Injury
5  Motor Vehicle Personal Injury
6  Other Personal Injury *(Please specify)*
7  Products Liability
8  Products Liability  Asbestos
9  All other Diversity Cases
*(Please specify)*

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration )*

I, Laura K. Mummert, Esq. , counsel of record or pro se plaintiff, do hereby certify

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 00 exclusive of interest and costs

☑ Relief other than monetary damages is sought

NOV - 8 2019

DATE 11/08/2019    PA ID # 85964
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I D # (if applicable)*

NOTE  A trial de novo will be a trial by jury only if there has been compliance with F R C P 38

Civ 609 (5.2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

19    5278

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Wardlow et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Pennsylvania Higher Education  Assistance | : | NO. |
| Agency et al. | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U S.C. § 2241 through § 2255.                    (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                           (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    (  )

(e) Special Management   Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases )                                                                      (X)

(f) Standard Management   Cases that do not fall into any one of the other tracks.          (  )

| | | |
|---|---|---|
| 11/8/2018 | *Laure Mummert* | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-399-4770 | N/A | lmummert@lowey.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

NOV -8 2019